(No. 45560.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant,
v. LEO SCOTT NUNN, Appellee.

*Opinion filed October 1, 1973.*

SCHAEFER, J., UNDERWOOD, C.J., and WARD, J., dissenting.

WILLIAM J. SCOTT, Attorney General, of Springfield

(JAMES B. ZAGEL and THOMAS M. BURNHAM, Assistant Attorneys General, of counsel), for the People.

DONALD M. RENO, JR., of RENO, O'BYRNE & KEPLEY, of Champaign, for appellee.

MR. JUSTICE DAVIS delivered the opinion of the court:

The defendant was charged with the unlawful possession of narcotics, hypodermic needles and syringes on the basis of certain items of physical evidence seized during a search of his locked quarters, consisting of a bedroom and adjoining kitchenette, accessible only therefrom, without a search warrant and without his consent. The search was consented to by his mother, in whose house the bedroom and kitchenette were located. The circuit court of Champaign County granted the defendant's motion to suppress this physical evidence. The appellate court affirmed (7 Ill. App. 3d 601), and we allowed the petition for leave to appeal at the January 1973 term.

The following facts have been stipulated to:

"On May 17, 1971, a hearing was held before the Honorable Frederick S. Green of the Circuit Court of the Sixth Judicial Circuit, Champaign County, Urbana, Illinois, on a motion to suppress certain evidence which was seized during the search on March 9, 1971, of the premises at 714 South State Street, Champaign, Illinois, the home of Mrs. Rose A. Nunn, mother of Defendant-Appellee.

On March 9, 1971, the date of the search, Defendant was nineteen years of age and had lived in Mrs. Nunn's home. During the time Defendant lived in Mrs. Nunn's house, there were no restrictions on her access to his room and no conversation whether police could enter therein.

Mrs. Nunn's only activity in Defendant's room was to clean it, to make his bed and to change the linen. Defendant paid no rent, but gave Mrs. Nunn five to ten dollars a week intermittently. Defendant could not recall the date he last worked prior to March 9, 1971.

Mrs. Nunn became concerned about the activity in her home during her absence when she returned once and found a marble top table broken. She discussed her concern with her former husband, the father of Defendant. Mr. Nunn unofficially tried to effect a search of Defendant's room by the police. Police declined unless Mrs. Nunn gave written consent. She went to the police station and gave written consent. She accompanied police officers to her home and was present during the search thereof. Police utilized their pass key to facilitate entry to Defendant's room.

The evidence, which was the subject of the motion to suppress, was seized from a waste basket and a cabinet over the sink both located in the kitchen. This kitchen was accessible only from Defendant's room.

Approximately ten to fourteen days next preceding the search, Defendant 'moved out', locked the door to his room and told Mrs. Nunn to allow no one to enter.

The Court found: that the area in which the suppressed articles were found had been set aside by the mother of the Defendant for his exclusive use, subject to her using the area for maintenance purposes and for caring for his personal effects, and that said mother had no authority to consent to the search. The Court allowed the motion to suppress."

The Federal and State courts, on varying factual circumstances, have not always been consistent in their conclusions in regard to the fourth-amendment rights of the party searched, where a co-occupant, third-party, has consented to a search and seizure.

The problem is not a new one in Illinois. Generally stated, we have followed the rationale that an equal or greater right to the use or occupancy of premises gives such co-occupant the right to consent to a search of the premises, and that any evidence found therein is admissible against a nonconsenting co-occupant. *People v. Koshiol (1970), 45 Ill.2d 573; People v. Haskell (1968), 41 Ill.2d 25; People v. Palmer (1964), 31 Ill.2d 58; People v. Palmer (1962), 26 Ill.2d 464; People v. Stacey (1962), 25 Ill.2d 258; People v. Speice (1961), 23 Ill.2d 40; People v. Perroni (1958), 14 Ill.2d 581; People v. Shambley (1954), 4 Ill.2d 38.*

The theory underlying these cases was not that the co-occupant was waiving another's right, but that he was exercising his own rights in consenting to the search. The questions of waiver, agency, apparent authority, and the like, were not reached under this theory.

In *Katz v. United States (1967), 389 U.S. 347, 353, 19 L. Ed. 2d 576, 583, 88 S. Ct. 507,* the court, in considering third-party searches and seizures, did not deem it important that the consent comes from one who has an equal or greater right to occupancy or use of the premises. The *Katz* test is based on the rationale that "the Fourth Amendment protects people—and not simply 'areas'— against unreasonable searches and seizures ***." It provides that a search will be reasonable only where there is probable cause for the search, and that a warrant may be issued only upon a showing of this probable cause. There are exceptions to this warrant requirement in cases of "hot pursuit" and in connection with searches made "incidental to arrest," and where the party searched gives his consent.

The United States Supreme Court has consistently held that the fourth and fifth amendments overlap in restricting the power of the States *(Boyd v. United States (1886), 116 U.S. 616, 29 L. Ed. 746)*, since they have the same basic purpose of maintaining inviolate large areas of personal liberty. *Feldman v. United States (1944), 322 U.S. 487, 88 L. Ed. 1408, 64 S. Ct. 1082.*

The purpose of the fourth-amendment warrant requirement is to assure that the decision as to whether there is probable cause to invade the privacy of the party to be searched is left to a neutral observer. Where the warrant is omitted, because of the consent search, this critical decision is left to the police officer, rather than a neutral observer. *Johnson v. United States (1948), 333 U.S. 10, 92 L. Ed. 436, 68 S. Ct. 367.*

The person searched must have an actual expectation of privacy, and this expectation must be reasonable. If such a reasonable expectation does exist, then either a warrant or the personal consent of the owner must be obtained. This general rule has been followed in *Combs v. United States (1972), 408 U.S. 224, 33 L. Ed. 2d 308, 92 S. Ct. 2284; Mancusi v. DeForte (1968), 392 U.S. 364, 20 L. Ed. 2d 1154, 88 S. Ct. 2120; United States v. Kahan (S.D.N.Y. 1972), 350 F. Supp. 784; United States v. Poole (E.D. La. 1969), 307 F. Supp. 1185.* Other cases following this basic theory have been faced with the question of what constitutes a valid waiver and have held that a *Miranda*-type warning should be given. (*United States v. Moderacki (D. Del. 1968), 280 F. Supp. 633; United States v. Blalock (E.D. Pa. 1966), 255 F. Supp. 268; United States v. Nikrasch (7th Cir. 1966), 367 F.2d 740.*) However, in the recent case of *Schneckloth v. Bustamonte (1973), 412 U.S. 218, 248-9, 36 L. Ed. 2d 854, 875, 93 S. Ct. 2041, 2059,* the United States Supreme Court stated: "Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into

account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent."

We acknowledge that the holding of the United States Supreme Court in *Katz,* that the fourth amendment protects people and not places, is not wholly consistent with the existing Illinois law on the subject. Therefore, to the extent that the *Shambley* line of cases is inconsistent with *Katz,* it is overruled.

The reason for furnishing the person to be searched with knowledge of his legal rights to exclude such search is to provide him with a meaningful basis for a choice. (*Johnson v. Zerbst (1938), 304 U.S. 458, 82 L. Ed. 1461, 58 S. Ct. 1019.*) It has been held that a police officer seeking consent to search should be required to inform the party to be searched of his right not to be searched without a warrant. *United States v. Moderacki (D. Del. 1968), 280 F. Supp. 633; United States v. Blalock (E. D. Penn. 1966), 255 F. Supp. 268; United States v. Nikrasch (7th Cir. 1966), 367 F.2d 740.*

The reasonable expectancy test leads us to an examination of whether in the case at bar, as a factual matter, the defendant's expectancy of privacy in the place where the seized property was located was reasonable, and if so, whether the purported third-party consent to the search was valid.

The general proposition that the law concerning search and seizure should not be based on the historic technicalities of the property law has been determined by the United States Supreme Court as follows: " *** it is unnecessary and ill-advised to import into the law surrounding the constitutional right to be free from unreasonable searches and seizures subtle distinctions, developed and refined by the common law in evolving the body of private property law which, more than almost any other branch of law, has been shaped by distinctions whose validity is largely historical. *** we ought not to bow to

them in the fair administration of the criminal law. To do so would not comport with our justly proud claim of the procedural protections accorded to those charged with crime." *Jones v. United States (1960), 362 U.S. 257, 266, 267, 4 L. Ed. 2d 697, 705, 706, 80 S. Ct. 725.*

Therefore, we look to waiver concepts to uphold the validity of a consent search. The appropriate standard for waiver of the fourth-amendment rights was recently set forth in *Schneckloth v. Bustamonte (1973), 412 U.S. 218, 248-9, 36 L. Ed. 2d 854, 875, 93 S. Ct. 2041, 2059.* That test is whether consent was voluntarily given. "Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent."

It has always been held that a person may waive his constitutional rights. It has also never been held that the fourth amendment bars searches and seizures other than those which are unreasonable. On the basis of the facts in this case, which indicate that the defendant's mother knew that she was not to enter his quarters or to allow anyone else to do so, the defendant had a reasonable expectation of privacy therein.

In *State v. Kinderman (1965), 271 Minn. 405, 136 N.W.2d 577, cert. denied, 384 U.S. 909,* the court held that a homeowner may give valid consent to search all of the rooms of his home, regardless of the age or relationship of the owner of the articles to the owner of the home, at least if no *bona fide* landlord-tenant relationship exists. In *Kinderman* the court held, three judges dissenting, that the father of a 22-year-old son, who was living in the father's house, could by freely and willingly giving his consent to a search of the entire house, make any search of that house reasonable. It held that since the fourth amendment does not prohibit all searches and seizures, but only unreasonable ones, and since the consent of the owner or person in

charge of the premises—the father in that case—was freely and willingly given, the evidence discovered during such a search was admissible. *Kinderman* has been explicitly followed by the courts of Washington (*State v. Vidor (1969), 75 Wash. 2d 607, 452 P.2d 961, 962-963*) and Maryland (*Jones v. State (1971), 13 Md. App. 309, 283 A.2d 184, 187*). A similar approach has been used by the State of Kentucky. In *Morris v. Commonwealth (1948), 306 Ky. 349, 354, 208 S.W.2d 58, 60,* the court stated: "We invariably have held that the head of a house, or the one in charge of the house at the time a search is made, may consent to its search, and such consent will render competent the evidence thus obtained. It is not necessary for the defendant himself to give consent, unless he is the head of the house or in charge of the premises at the time the officers commence the search."

Texas follows basically the same use and occupancy test as Illinois (*Sorensen v. State (Tex. Crim. App. 1972), 478 S.W.2d 532*), but the court noted in *Sorensen* at page 533, in upholding a search of the mother's house with her consent, that "She had never been instructed to stay out of his [the son's] room ***", thus adding the consideration of a reasonable expectancy of privacy facet to that test.

On the other hand, some courts have implicitly or explicitly rejected the *Kinderman* rationale. These courts are those which reach the waiver question. In *State v. Evans (1962), 45 Hawaii 622, 372 P.2d 365,* the Supreme Court of Hawaii held that a search made with a wife's consent could not be valid as to the husband's personal effects. The Supreme Court of the State of Arizona has said in *State v. Pina (1963), 94 Ariz. 243, 247, 383 P.2d 167, 169,* "It is the better rule that a spouse is not impliedly authorized by reason of the husband-wife relationship to waive the constitutional protection."

Turning to the question of whether the defendant in this case had a reasonable expectation of privacy in the

quarters which were searched, under the stipulated facts, the son locked the bedroom door and told his mother not to enter and not to allow anyone else to enter. She offered no objection to his request. Regardless of whether the defendant had a reasonable expectation of privacy before the door was locked, there is no doubt that such an expectation was reasonable in view of the mother's past actions in the room, and her failure to object to his request that she was not to open the locked door. The property right of the mother in the locked rooms should be considered only to the extent that it bears on the reasonableness of the defendant to expect her not to exercise those rights. In view of the entire factual situation involved, we find that the defendant reasonably expected that his mother would neither enter the quarters herself, nor allow others to enter.

Having established that the defendant had a reasonable expectation of privacy in the locked quarters, the seizure of the contraband was in violation of his fourth-amendment rights if no valid waiver of those rights was effected.

There is no evidence in the record which tends to establish that the defendant voluntarily waived his fourth-amendment rights.

Under the *Katz* test, the starting point is whether the son believed that his mother would not enter the locked rooms or allow others to enter. It is apparent from the mere fact of the precautions taken that he believed that the locked rooms would not be gone into by anyone. The next question is whether this belief was one which society views as being reasonable. It is at this point in the analysis of the case that care must be taken to separate out strict property-law concepts from the finding of reasonableness. The test cannot be made merely on the basis of the mother's property right in the house, but rather consideration should be given to whether the totality of her actions as to the son made his expectation of privacy reasonable.

The court properly found that the defendant's mother had set aside these rooms for the defendant's exclusive use, subject to her using the area for housekeeping purposes and for caring for his personal effects.

The question still arises as to whether the police were acting reasonably in assuming a grant of authority from the son to the mother to open the locked rooms when the mother did not explicitly mention any such grant, and indeed after she informed them that she had been told to stay out of the rooms. It must be admitted that, in the face of such knowledge, the police knew that the defendant was in no way consenting to their search of his property.

Since we hold the fourth-amendment rights protect persons, not simply areas, and since there was no valid waiver of these rights, the appellate court must be affirmed.

We should, however, also address ourselves to the proposition urged by the State that the recent decision of *Coolidge v. New Hampshire (1971), 403 U.S. 443, 29 L. Ed. 2d 564, 91 S. Ct. 2022,* serves to validate searches such as that which took place here. The relevant portion of the *Coolidge* decision phrased the test for third-party consent as, "*** whether Mrs. Coolidge, in light of all the circumstances of the case, must be regarded as having acted as an 'instrument' or agent of the state when she produced her husband's belongings." (403 U.S. 443, 487, 29 L. Ed. 2d at 595.) The crux of the argument is that as Mrs. Coolidge was not operating as an instrument of the police, there was no State action, and therefore no violation of the defendant's fourth-amendment rights. The theory is that no "search" was made at all, but rather there was a voluntary turning over to the police of the defendant's property by Mrs. Coolidge, a private citizen.

That evidence which would be inadmissible if seized by the police is admissible if seized by some nonpolice related third-party, is established in both the Illinois and

Federal courts. *Gindrat v. People (1891), 138 Ill. 103, Burdeau v. McDowell (1921), 256 U.S. 465, 65 L. Ed. 1048, 41 S. Ct. 574.*

This case is distinguishable on its facts from *Coolidge.* The police in *Coolidge* were questioning Mrs. Coolidge after her husband had been interrogated in reference to a kidnapping-murder. They asked her whether her husband owned any guns, and she voluntarily produced 4 guns and handed them to the police. They asked if she knew which pants her husband had worn on the evening of the disappearance, and she provided the police with four pair of pants, claiming he had worn one of the four on the evening in question. The actions of Mrs. Coolidge in obtaining these articles and handing them over to the police was done without the request of the police. The court specifically found no coercion to be present. Therefore, there was no search by a government representative. The court noted specifically (403 U.S. at 488) that the police did not go to the Coolidge residence for the purpose of rummaging around.

On the other hand, the sole purpose of the police in the instant case was to rummage through the rooms, which had been occupied and then locked by the defendant. Although they went at the request of the defendant's mother, it was the police and not the mother who entered the locked rooms by use of a skeleton key. It was the police, while rummaging through the room, who discovered the contraband. This case is clearly an example of government action. *Coolidge* therefore, does not validate this search.

In summary, we find that the defendant had a reasonable expectation of privacy, and that this reasonable expectation was afforded the protection of the rights granted by the fourth amendment. No valid waiver of rights having been made, and a search by policemen having been performed, the defendant's fourth amendment rights were violated and the evidence seized during this search is inadmissible.

The judgment of the appellate court is therefore affirmed.

*Judgment affirmed.*

MR. JUSTICE SCHAEFER, dissenting:

The opinion of the majority is based upon the defendant's "reasonable expectation of privacy." In my opinion what the defendant expected is irrelevant. What is significant is the reasonableness of the conduct of the police officers. Viewed from their perspective, the record shows that they were asked by the defendant's mother to open the locked door and search the area in which the suppressed articles were found. I see nothing in the stipulated facts to indicate that the police officers had been informed of any restrictions upon the mother's right to ask them to do what they did. And in the absence of such an indication, it seems to me that neither they nor we should be concerned with the details of any unusual conditions relating to the minor defendant's occupancy of a portion of his mother's apartment.

MR. CHIEF JUSTICE UNDERWOOD joins in this dissent.

MR. JUSTICE WARD, also dissenting:

I would join in Mr. Justice Schaefer's dissent, and add: The son had "moved out" of his mother's house 10 to 14 days preceding the search requested by his mother. He was no longer a co-occupant of the quarters he had vacated. Under the circumstances I find it strange that the majority can conclude that, by locking a door, forbidding his mother to enter or permit others to enter, the son developed, when his mother made no formal objection, a reasonable expectation of privacy in the rooms from which he had moved. I would not hold that he thereby gave himself a right of sanctuary—of what duration we do not know.