THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* CHARLENE KAY JOHNSON, Defendant-Appellant.

(No. 74-388;

Third District—September 16, 1975.

Robert I. Auler, of Champaign, for appellant.

Robert E. Boyer, State's Attorney, of Watseka, for the People.

Mr. JUSTICE STOUDER delivered the opinion of the court:

A jury in the circuit court of Iroquois County found Charlene Kay Johnson guilty of murder. The defendant was sentenced to the Department of Corrections for a minimum term of not less than 14 nor more than 24 years.

On January 23, 1974, the defendant and the murder victim, Patricia Boufford, lived together along with Patricia Boufford's three infant children in a trailer located at 102½ Popular, Onarga, Illinois. The defendant also resided at an adjacent house located at 102 Popular in which her mother and her brother, Terry Kammerman, also lived.

On January 23, 1974, at approximately 7:30 p.m., the defendant knocked on the front door of the Kammerman home; the defendant was crying and upset and in a highly intoxicated condition. She told Kammerman that something was wrong at the trailer. Defendant returned to the trailer with Kammerman who observed the body of Patricia Boufford lying face down in a pool of blood. The minor children were also present. Kammerman removed the children from the trailer and then returned to remove a 20-gauge shotgun which was located inside the trailer just in front of the door about a yard from the body of Mrs. Boufford. Kammerman took the shotgun to his house and placed it upstairs. He then called an ambulance and the police.

Shortly after 8 p.m., Clarence Talbert and Russell Enz arrived at the trailer with an ambulance. They examined the body and after finding the lack of any vital signs called the coroner.

Russell Enz then heard whispering and he looked up to see the defendant and her brother. Enz testified that he heard the defendant say she hoped "the bitch was dead" and "I am glad the old slut is dead." He

also testified that he heard the defendant say to Clarence Talbert: "Why don't you get the old bitch out of here, the old drunken bitch out of here." Enz testified that the defendant "was as drunk as any person I have ever seen." Enz also stated he believed the defendant thought Mrs. Boufford was alive at this time.

At one point Talbert informed defendant that Mrs. Boufford was dead and the defendant replied "well, if she is dead, why don't you book me?"

Talbert testified that he heard the defendant say: "The old drunken bitch is dead, why don't you get her out of here, drag her out." He stated that the defendant was extremely intoxicated and that he did not think she would have said some of these things otherwise.

The ambulance drivers awaited the arrival of the coroner and the police. During this time the defendant sat at a table and drank from a liquor bottle.

When Deputy Carmichael arrived he entered the trailer, examined the body and asked Terry Kammerman where the gun was. In the company of both officers, Kammerman proceeded to the house to retrieve the weapon. He then handed it over to Carmichael who was standing inside the house.

Both Deputy Carmichael and Pat Thomas, a State crime-scene technician from the I.B.I., conducted a crime-scene investigation at the trailer for the purpose of collecting evidence. In the bathroom of the trailer there was a blouse that contained damp blood. The stains were later determined to be blood of the same type as Mrs. Boufford's. Also found at the top of a garbage can in the same room as the victim was an empty shotgun casing. On the refrigerator a box of live shotgun shells was also found. The shotgun removed from the scene by Terry Kammerman was examined and found to be a 20-gauge single-barrel shotgun. No fingerprints were found and the weapon appeared to have been wiped. There was no expended cartridge inside the weapon. The examination of the weapon and the cartridge from the garbage can by a firearms and tool marks examiner for the I.B.I. revealed that the cartridge found in the trash can had been fired in the shotgun found at the scene. Also, shots removed from the decedent were found to be number 5 shot, the same size as the shot found in the unexpended cartridges found on the refrigerator.

An examination of the doors and windows by crime-scene personnel revealed no signs of a forcible entry into the trailer. Defendant testified the door was normally locked.

A female deputy sheriff, who was an Alcoholic Treatment Coordinator Counselor and who attended various alcoholic treatment institutes and seminars, arrived at approximately 10:30 p.m. and took the defendant

into custody. She was with her from that time until after 2 a.m. on the following day. The female deputy testified that the defendant was responsive to her questions, that she understood what the deputy told her, that she needed no assistance in walking, and that there was no unusual behavior.

The shotgun, which was found at the scene and which was identified as having fired the expended cartridge found at the scene, was purchased on January 15, 1974, along with a box of shotgun shells, eight days before the murder, by the defendant.

There was no evidence from the defendant or any other witness that any person was at the scene at the time of or prior to the shooting. Terry Kammerman, the defendant's brother, had been in and out of the trailer during the day. He testified that no one was present except the victim, the three children and the defendant. Kammerman also testified that defendant was "highly intoxicated" and "as drunk as she could be without passing out."

The defendant was taken to the City Hall where a discharge residue test was performed on her fingers to determine if she had recently fired a weapon. The results of the test proved negative. Pat Thomas, who performed the test, testified that at that time defendant was "very intoxicated."

At about 11:30 p.m., defendant was taken to the Iroquois Hospital where blood alcohol tests and a blood-type test were performed. The defendant's blood was determined to be of a different type than that of the deceased. The defendant's blood alcohol at the time the test was performed was 356 milligrams or .356 percent. Rebecca Shelly, the certified laboratory assistant who performed the blood alcohol test, testified that the .356 reading was the highest one she had ever seen and that her training led her to believe that .356 was an extremely high level. She also testified that 50 milligrams, expressed as .05 percent, is considered normal and that the .356 reading may be considered about seven times normal.

As to the medical significance of the .356 reading, Dr. Stan Bobowski, a pathologist at Burnham City Hospital in Champaign, Illinois, testified that a person intoxicated to the .356 level is entering the "anesthesia stage" and that .4 results in unconsciousness. He further testified that between .30 and .35 things get very confused and slurred to the person and that at these levels, alcohol acting on the frontal lobes completely depresses the brain and it doesn't act. Bobowski also testified that the alcohol effect at the .3 level and above can cause a person to say things he does not mean or intend.

Dr. Bobowski also testified that from the time defendant had first in-

gested alcohol, her body was working to rid itself of alcohol. He stated that the liver eliminates 90 percent of the alcohol at a rate of .05 grams an hour. This rate of decrease is not affected by an extremely high alcohol level in the body. The body also works to rid itself of alcohol through urine, perspiration, and the lungs. It takes 60 to 90 minutes for alcohol to start absorption into the bloodstream after it reaches the stomach. The elimination of alcohol from the body begins immediately and does not depend upon the cessation of drinking before that process begins. The liver and the body are constantly eliminating alcohol even though some additional alcohol is being ingested.

The defendant testified that she was "very drunk" and that during the course of the day she was drinking constantly and a lot. Although she could not remember exactly how much she had to drink, she knew she had been drinking bourbon, brandy and beer. As to the events of January 23, 1974, defendant testified that "everything seemed sorta dreamlike * * * very foggy and very vague." She stated that she could not remember the events that occurred and their relevant times or any statements that she made. She did have brief snatches of memory such as "getting the kids up" and that the television was on during the day. She also remembered that at some time she took out garbage and went to bed because she felt sick. With respect to Mrs. Boufford, the defendant recalled seeing blood but did not remember anything further.

An autopsy was performed upon the body of Mrs. Boufford the next day. Dr. Albert Miller, the pathologist who performed it, was of the opinion that Boufford died as a result of a gunshot wound to the right shoulder. He also determined that at the time she was shot, Boufford was under the influence of an extremely high degree of alcoholic intoxication since her blood sample showed a level of .346 percent alcohol. As to the medical significance of the .346 level, Dr. Miller testified that it would be enough to severely affect the coordination and physical skills of the deceased and to greatly impair her mental faculties and capacities. He also testified that a person under a .346 could very well be staggering and have a good deal of slurred speech and might not be able to stand.

On this appeal, the defendant assigns as error the following: (1) The evidence is insufficient to establish her guilt beyond a reasonable doubt; (2) The degree of intoxication was sufficient to negative the existence of the mental state required for murder; (3) That certain extrajudicial statements made by the defendant to the ambulance drivers were erroneously admitted as evidence; (4) The admission into evidence of the physical evidence seized at the scene of the murder was improper; (5) The admission into evidence of testimony concerning firearm and ballistic tests was improper; (6) The admission into evidence of certain hearsay

constituted prejudicial error; and (7) the trial court's refusal to instruct the jury on reckless conduct was also improper.

■■ First, the defendant contends that the evidence is insufficient to establish her guilt beyond a reasonable doubt and argues that since the evidence is wholly circumstantial it tends only to prove that she had the opportunity to commit the crime as charged not that she did, in fact, commit it. In her brief, defendant has presented various hypotheses, consistent with her innocence, to explain the death of Mrs. Boufford. These arguments were also made to the jury who refused to believe them. It is well established, however, that a conviction will be sustained upon circumstantial evidence. It is possible to conjure up hypotheses which might be inconsistent with the defendant's guilt. Yet, the requirement that the defendant be proved guilty beyond a reasonable doubt does not mean that the jury must disregard the inferences which flow normally from the evidence before it. A jury is not required to search out a series of potential explanations compatible with innocence and elevate them to the status of reasonable doubt. *People v. Russell*, 17 Ill.2d 328, 161 N.E.2d 309.

While it is true that admissions standing alone are insufficient to sustain a judgment of conviction, we do not find the defendant's admission to be the only evidence against her. The evidence concerning the blouse and the gun and the presence of defendant in the trailer some time after the killing were sufficient to permit the jury to find the defendant guilty beyond a reasonable doubt. The jury found that the evidence established the defendant's guilt beyond a reasonable doubt. The jury further was properly instructed as to the weight to be given circumstantial evidence. In these circumstances we believe that the jury's determination should not be upset as the evidence is not contrary to the verdict.

■■ Alternatively, defendant contends that even if she performed the acts charged, the State failed to prove beyond a reasonable doubt that she committed such acts with the requisite intent to kill or do great bodily harm because the extreme degree of defendant's intoxication rendered her incapable of forming the requisite mental state for murder.

In its case in chief the State presented evidence concerning the blood alcohol of defendant 4 hours after the murder. At the trial the defendant presented testimony of a pathologist who testified as to the significance of the reading. The defendant, however, did not submit for the court's consideration any instructions with respect to the defense of voluntary intoxication.

In order to prove the defendant guilty beyond a reasonable doubt, the State must show that the accused was capable of forming the requisite intent to commit the murder. The test in Illinois is whether the intoxica-

tion is so extreme as to entirely suspend the power of reason. *People v. Lion*, 10 Ill.2d 208, 139 N.E.2d 757.

In order to sustain her claim that she was incapable of forming the necessary intent to commit murder, the defendant relies principally upon the testimony concerning her extremely intoxicated condition and the blood alcohol tests.

We believe, however, that the jury could well have decided on the record that under all the testimony and evidence adduced at trial she could not have been so intoxicated as to negate the required mental state. The evidence, for example, shows that from 7:30 p.m. until 10:30 p.m. when Deputy Sheriff Florence Cordes took the defendant into custody, the defendant continued to drink. The deputy sheriff, who was with the defendant from approximately 10:30 p.m. until 2 a.m., observed her walk and talk and testified that the defendant answered and understood questions, that she needed no help in walking, that she was conscious, that she was not physically suffering from the alcohol and that she displayed no unusual behavior. In addition, the blood alcohol test was administered to the defendant at 11:30 p.m. Based on the record, therefore, the jury could well have found that the results of the test were attributable to the defendant's drinking in the period following 7:30 p.m. and that at the time of the homicide defendant was not so intoxicated as to negate the required mental state for murder.

The weight to be given the testimony relating to intoxication and the inferences to be drawn, therefrom were peculiarly within the province of the jury. The verdict was not palpably against the evidence and the conviction must therefore be affirmed. *People v. Fuller*, 17 Ill.App.3d 1005, 309 N.E.2d 96.

Defendant next argues that where intoxication negatives the existence of a mental state which is an element of the offense of murder, she cannot be guilty of voluntary manslaughter but the court may reduce the degree of homicide to involuntary manslaughter or a lesser offense.

We first note that at trial, defendant failed to submit to the court an involuntary manslaughter instruction. Second, even if the evidence were sufficient to establish the defense of voluntary intoxication, the degree of homicide might be reduced to voluntary manslaughter but not to involuntary manslaughter. *People v. Cunningham*, 123 Ill.App.2d 190, 260 N.E.2d 10.

■■ The defendant further argues that the trial court erred in admitting into evidence certain extrajudicial statements made by the defendant to the ambulance drivers.

At the trial Clarence Talbert testified that he heard the defendant say to him "Well if she is dead, why don't you book me?" Enz, the other

driver, testified that he heard the defendant say "I hope the bitch is dead" and both men testified as to statements of similar effect.

The defendant urges in effect that these statements were inadmissible because they do not constitute admissions. We find this argument to lack merit. These statements were properly admissible since they were made by the accused and because they were pertinent to an issue which tended, in connection with the proof of other facts, to prove her guilt. *People v. Richardson*, 21 Ill.2d 435, 172 N.E.2d 801.

Alternatively, defendant urges the trial court committed reversible error in admitting these statements because they were involuntarily made as a result of the defendant's extreme intoxication. The trial court admitted these statements after denying defendant's motion in limine and over defense objections at trial.

The decision of the trial court on the question of whether the statements were voluntary will not be disturbed unless against the evidence or unless the court clearly committed an abuse of discretion. We believe that defendant's intoxication did not preclude the admissibility of these statements but only affected the weight to be accorded them. Since this matter was properly left to the trier of fact, no error was committed.

■■ The defendant further argues that the trial court erred in denying her motion to suppress physical evidence seized in violation of her fourth amendment rights.

Defendant complains of the removal from the trailer of the blood-stained blouse, the 23 super X shells, and the expended shell, by the crime-scene investigators. She relies on *People v. Nunn*, 55 Ill.2d 344, 304 N.E.2d 81, and argues that the police were required to obtain a warrant or the owner's consent prior to the search of the trailer.

This contention overlooks the case of *People v. King*, 54 Ill.2d 291, 296 N.E.2d 731. In *King*, immediately after a shooting two police officers responded to the call. They found two bodies in a second-floor apartment. One went into the front bedroom which was next to the doorway where the bodies were found. This was the defendant's room and it was there that the officer found a box for a gun, later admitted into evidence, through which it was established that the defendant had recently bought a gun of the type used in the shootings. The box was apparently in plain sight but the officer also testified that during his search he "looked through the drawers to find out who lived in the apartment."

The court ruled that the conduct of the officer did not violate the defendant's constitutional rights:

"The officer knew that a woman had been shot, but he did not know who had been shot or who had done the shooting. It was his right and his duty to be where he was, and no constitutional

provision required him to disregard what he saw. The unplanned search, in a setting of immediate violence, does not, in our opinion, suggest either the necessity for a warrant or a violation of the defendant's right to be free from unlawful search and seizure."

See also *People v. Brooks,* 7 Ill.App.3d 767, 289 N.E.2d 207.

We believe that in the instant appeal, as in *King,* the police officer had a right and a duty to be where he was since he was only responding to a call. The circumstances existing in the trailer upon his arrival did not preclude the search.

■■ Defendant also complains of the admission into evidence of the shotgun which was removed from the adjacent house by the defendant's brother Terry Kammerman. Kammerman surrendered the weapon to the police officers after obtaining it from the upstairs portion of the house next door where he had placed it. Defendant again relies on *People v. Nunn,* 55 Ill.2d 344, 304 N.E.2d 81.

Defendant argues that Terry Kammerman did not voluntarily consent to the seizure of the gun; alternatively, even if the consent was voluntary, he had no authority to consent.

As a preliminary matter, the People dispute whether defendant has standing to object to the search since she had been staying at the trailer. Without resolving this matter, we shall assume that defendant had standing to object to the seizure of the shotgun.

In order to sustain her claim that Kammerman's consent was not voluntary, defendant relies upon the testimony of Kammerman. Kammerman testified that Deputy Sheriff Carmichael informed him at the trailer "you know we are going to have to have the gun." Carmichael also told Kammerman to "go get it." From this and other testimony of similar import, defendant argues that the police did not merely request the shotgun, but rather commanded Kammerman to retrieve it.

The question of whether consent has been given is a factual matter to be initially determined by the trial court and where the evidence and the issue is in conflict the reviewing court will accept the finding below unless it is clearly unreasonable. Because a court of review is not in a position to observe the witnesses as they testify, questions of credibility and the weight to be given their testimony must be left largely in the discretion of the trial court. We believe the trial court's determination, predicated upon the credibility of the witnesses, that Kammerman consented to the search was not contrary to the evidence.

Alternatively, defendant urges that even if Kammerman's consent was voluntarily obtained, he did not have the authority to consent. It is well established, however, that where two persons have equal rights to the use and occupancy of a premises, either party may consent to a search

of the premises and evidence seized thereby may be used against either of them. (*People v. Marino*, 5 Ill.App.3d 778, 284 N.E.2d 54.) Since Kammerman resided in the house from which the gun was retrieved, he had authority to consent to the search.

We believe defendant's reliance on *People v. Nunn*, 55 Ill.2d 344, 304 N.E.2d 81, is misplaced. Unlike *Nunn*, here the defendant did not have the exclusive use of any portion of the house from which the gun was retrieved. Even if such exclusive use were, however, present, the record does not show in which portion of the house the gun was placed. Thus no reasonable expectation of privacy requires protection in the circumstances here present. No error was committed in admitting the physical evidence.

■■ We turn next to the contention of the defendant that the qualifications of the expert witness, Karl Lattig, were not properly established. Consequently, the defendant urges that the trial court erred in admitting into evidence the testimony concerning firearm and ballistic tests.

Lattig testified that he was the firearms and tool marks examiner for the Illinois Bureau of Identification. He testified that he receives evidence from various police agencies throughout the State of Illinois and performs forensic examinations on the evidence. He has a Bachelor of Arts degree in the field of zoology and studied works in the field of firearms and tool-mark examination. He worked simulated casework in the field of tool marks and then took a practical examination, tool-mark identification being an extension of firearms identification. After working a period of casework in firearms identification, he passed another battery of practical tests. Then he worked under the supervision of a laboratory supervisor and other firearms and tool-mark examiners in the Illinois Bureau of Identification Laboratories. He had previously testified in court as an expert with regard to such examination in other cases. He testified that he had studied various works named by author in the subject of ballistics.

Over defense objection, the court allowed Lattig to express his opinion that an empty shotgun-shell cartridge found at the scene was fired in the shotgun found at the scene.

Generally, an expert witness is qualified if because of his skill, training or experience he is better able to form a more accurate opinion as to the matters under consideration than the ordinary person. (*People v. Fiorita*, 339 Ill. 78, 170 N.E. 690.) The test of qualifications, however, is a relative one which depends upon the matter under consideration and the fitness of the witness. The determination of whether a witness is qualified to testify as an expert lies within the discretion of the trial court. *People v. Pruitt*, 16 Ill.App.3d 930, 307 N.E.2d 142.

We find that Lattig's skill, training and experience qualifies him to be an expert in the area of firearm and ballistic tests. The trial court did not abuse its discretion in permitting Lattig to testify that an empty shotgun shell cartridge found at the scene was fired in the shotgun found at the scene.

■■ The defendant next urges the trial court committed error in permitting Russell Enz, the ambulance attendant, to testify as to a statement made out of court by Terry Kammerman the defendant's brother. The defendant contends the admission of such hearsay constituted prejudicial error.

On direct examination of Russell Enz by the State's attorney, the following exchange occurred:

"Q. Now what happened next, if you recall?
A. Well, when I seen Terry standing there, I says, Terry, what in the hell happened and he says there has been a shooting."

The trial court ruled the statement was not offered to prove the truth of the matter asserted, but rather to show that the statement was made and therefore it was not hearsay. We believe the trial court did not commit error since an out-of-court statement is not hearsay if it is offered to show knowledge on the part of hearer of the subject matter of the statement, regardless of the truth of the statement. Gard, Illinois Evidence Manual R. 147, at 170 (5th ed. 1963).

Even if the statement did constitute hearsay, we are unable to determine in what fashion its admission was prejudicial. Since there was other convincing testimony that the shooting did in fact occur and testimony that the deceased died as a result of a shotgun blast, error, if it occurred, was harmless.

■■ Finally, the defendant argues that the trial court erred in refusing defendant's instruction on reckless conduct.

At the conference on jury instructions the defendant tendered an instruction on the crime of reckless conduct. The court refused the instruction but agreed to give an involuntary manslaughter instruction if tendered by the defendant.

Defendant urges that the refusal to instruct with respect to reckless conduct constituted error since reckless conduct must be deemed a lesser-included offense to the charge of murder or voluntary manslaughter or involuntary manslaughter.

The test of the need for instructing the jury on a lesser-included offense is whether there is evidence in the record tending to support commission of the latter and relatively minor crime. The practice of giving instructions on abstract questions of law which have no relation to the evidence

before the jury has always been condemned, and the test is whether there is sufficient evidence in the record to warrant such an instruction. *People v. Virgil*, 19 Ill.App.3d 744, 312 N.E.2d 816.

In *Virgil*, an analogous situation was presented. There the defendant was charged with aggravated battery by virtue of great bodily harm. The trial court refused the simple battery instruction tendered by defendant. The evidence showed that the complaining witness was attacked with a sharp instrument and a threat was made to cut her throat. Her throat actually was cut to such an extent that she bled profusely. There was not a shred of evidence to the contrary. The court held that the inevitable result of this evidence beyond a reasonable doubt was that the victim suffered great bodily harm. Although the defendant was necessarily guilty of simple battery, the court ruled that "it cannot be successfully contended that the result of all the evidence constitutes in its totality proof of guilt of simple battery as distinguished from aggravated battery."

The offense of involuntary manslaughter concerns the death of an individual while reckless conduct deals with the infliction of bodily harm. The evidence in this case establishes that the decedent was killed. There was no evidence that the defendant only inflicted bodily harm. Consequently, it cannot be successfully contended that the result of all the evidence constitutes proof of guilt of reckless conduct as distinguished from involuntary or voluntary manslaughter. The trial court, therefore, did not err in refusing to instruct the jury on reckless conduct.

For the foregoing reasons, the judgment of the circuit court of Iroquois County is affirmed.

Judgment affirmed.

ALLOY and STENGEL, JJ., concur.