204 N.J. Super. 265 (1985)
498 A.2d 364
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
LARRY DOUGLAS, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted July 16, 1985.
Decided September 13, 1985.
*268 Before Judges DREIER and DEIGHAN.
Thomas S. Smith, Acting Public Defender, attorney for appellant (Bruce J. Kaplan, of counsel and on the brief).
Irwin I. Kimmelman, Attorney General of New Jersey, attorney for respondent (Patricia E. Stern, Deputy Attorney General, of counsel and on the brief).
The opinion of the court was delivered by DEIGHAN, J.A.D.
*269 Defendant appeals from a jury conviction of armed robbery in violation of N.J.S.A. 2C:15-1, unlawful possession of a handgun without a permit in violation of N.J.S.A. 2C:39-1b and N.J.S.A. 2C:58-4, and possession of a handgun for unlawful purposes in violation of N.J.S.A. 2C:39-4a. He was sentenced to the Youth Correctional Institute Complex for an indeterminate term, not to exceed 20 years, for the armed robbery conviction and a concurrent indeterminate term, not to exceed five years for the unlawful possession of a handgun.[1] The conviction for possession of the weapon for an unlawful purpose was merged with the armed robbery conviction. A Violent Crimes Compensation Board penalty of $300 was imposed.
On December 26, 1980 at approximately 5:15 p.m. an armed robbery was perpetrated at Fulton Hardware in Jersey City, New Jersey. The owner, Michael Totaro and an employee, Michael Howell, were present when four or five men entered the store. One of the men approached Howell and subsequently, at gunpoint, ordered him to lie face down on the floor.
At about the same time one of the other men approached Totaro who was standing behind the counter near the cash register. A scuffle followed and Totaro was shot in the shoulder. However, Totaro managed to take out his own gun and wound one of the robbers, later identified as Jeffrey Benjamin. All of the other robbers fled. The police arrived at the scene at approximately 5:30 p.m. and Totaro and Benjamin were taken to a hospital. Howell was taken to the police station where he gave a statement and identified the defendant from a group of eight photographs.
Meanwhile, as the result of a conversation with Jeffrey Benjamin, the wounded assailant, Officer Gallagher, together with Detective Deleva went to defendant's apartment. Defendant's mother answered the door and defendant was in his bedroom which did not have a separate door. Officer Deleva informed Mrs. Douglas that her son was a possible suspect in *270 the armed robbery and asked defendant, who was in bed, to get dressed and requested both defendant and his mother to accompany him to the police station. They complied and went to the police station with the officer.
When they arrived at the police station, Officer Deleva learned that the witness Howell identified defendant in a photographic line up. On this basis he arrested the defendant and requested Mrs. Douglas to sign a consent order to search her apartment. She complied and Detective Gallagher and Officer Deleva, together with Mrs. Douglas, returned to the apartment.
Upon their arrival at the apartment, the officers went directly to defendant's bedroom to start their search. Ultimately, a 22 caliber revolver was found in the bedroom on the floor under defendant's bed. There were two spent cartridges and two live rounds of ammunition in the revolver.
The day after the robbery Detective Logan went to the hospital and obtained a written statement from the victim, Totaro. Additionally, the officer had Totaro view an array of eight photographs. Totaro selected defendant's photograph from the array and identified him as one of the assailants.
Prior to trial defendant moved to suppress the revolver as evidence. At that hearing Officer Deleva testified that when Mrs. Douglas agreed to sign the consent to search form, he advised her of her right not to sign the form and then permitted her to read the form. He testified that Mrs. Douglas indicated she understood the form and then signed it in the officer's presence. Officer Deleva also stated that defendant witnessed the procedure and in fact gave his verbal consent to the search.
Defendant testified at the suppression hearing and denied that he was asked to consent to the search. He further stated that although his mother was requested to sign the consent, she refused. He examined the consent form and insisted that the *271 signature was a forgery.[1a] At the conclusion of the hearing Judge Grossi denied the motion to suppress and ruled that the revolver may be admitted into evidence.
At trial, the victim, Totaro testified to the circumstances surrounding the robbery as related above. The witness Howell also testified but was unable to identify defendant as one of the robbers. He testified that he recognized defendant's picture at the out-of-court identification because he had previously seen defendant in the store but he could not remember whether defendant was in the store on the date of the robbery nor could Howell make an in-court identification of defendant.
At trial, Officer Gallagher testified that although his name appeared as a witness on the consent form he could not recall whether he was present when Mrs. Douglas signed her name. He did recall, however, that Mrs. Douglas gave her oral consent. He also testified that he heard defendant tell his mother not to give her consent.
The bullet which struck Totaro was surgically removed and preserved as evidence. At trial, a ballistics expert testified that the removed bullet had been fired from defendant's revolver.
On appeal defendant contends that:
POINT I DISCLOSURE TO THE JURY OF INCULPATORY INFORMATION SUPPLIED BY A CO-DEFENDANT WHEN THE CO-DEFENDANT DID NOT TESTIFY, VIOLATED THE HEARSAY RULE AND DEFENDANT'S CONSTITUTIONAL RIGHT TO CONFRONTATION (Partially raised below).
POINT II THE TRIAL JUDGE COMMITTED REVERSIBLE ERROR WHEN HE DENIED DEFENDANT'S MOTION TO SUPPRESS.
A. The State Failed To Prove That Mrs. Douglas Had The Authority To Consent To the Search of The Defendant's Bedroom. (Not raised below).
B. The State Failed To Prove That Mrs. Douglas Freely And Voluntarily Consented To The Search Of Her Apartment.
POINT III THE TRIAL JUDGE COMMITTED REVERSIBLE ERROR WHEN HE FAILED TO RECONSIDER THE ISSUE OF CONSENT IN LIGHT OF THE TESTIMONY ELICITED AT TRIAL. (Not raised below).

*272 POINT IV THE SENTENCE IMPOSED IS EXCESSIVE, UNDULY PUNITIVE AND AN ABUSE OF JUDICIAL DISCRETION.
At trial, Jeffrey Benjamin, the robber who was wounded by Victor Totaro, was not called as a witness. On direct examination of Officer Gallagher it was elicited that as a result of a conversation he had with Benjamin, he went to defendant's apartment. The only objection to this conversation was that the question was leading.
Defendant contends that disclosure to the jury of inculpatory information supplied by a co-defendant who did not testify deprived him of his constitutional right to confront a witness, contrary to the ruling in State v. Bankston, 63 N.J. 263 (1973). The State submits that the circumstances under which the disclosure was made, together with the evidence in the case and the court's instruction, there is no reversible error.
It is well settled that the hearsay rule is not violated when a police officer explains the reason he approached a suspect or went to the scene of the crime by stating that he did so "upon information received." Bankston, 63 N.J. at 268. Such testimony has been held to be admissible to show that the officer was not acting in an arbitrary manner or to explain his subsequent conduct. However, when the officer becomes more specific by repeating what some other person told him concerning a crime by the accused the testimony then violates the hearsay rule. Ibid. Moreover, the admission of such testimony violates the accused's Sixth Amendment right to be confronted by witnesses against him. Id. at 269. When the logical implication to be drawn from a witness' testimony is that a nontestifying witness has given the police evidence of the accused's guilt, the testimony should be disallowed as hearsay. Id. at 271; accord, State v. Manning, 82 N.J. 417, 422 (1980); State v. Thomas, 168 N.J. Super. 10, 16 (1979).
In the event there has been a violation of the hearsay rule, the reviewing court may scrutinize the error either as plain error or harmless error, which ever is appropriate. See *273 State v. Bankston at 63 N.J. 272-273; State v. Thomas at 17. R. 1:7-5 and R. 2:10-2 codify the definitions of "plain" and "harmless" error as they have evolved through case law. In effect, plain error is defined as one which is of such a nature as to have been capable of producing an unjust result. If it is of such a nature, then, necessarily, it prejudices a substantial right. Pressler, Current N.J. Court Rules, Comment R. 1:7-5. If it is not of such a nature it does not prejudice a substantial right and is, therefore, harmless. Id. citing State v. Gardner, 51 N.J. 444, 456 (1968).
As stated in Bankston at 63 N.J. 273:
The test of whether an error is harmless depends upon some degree of possibility that it led to an unjust verdict. The possibility must be real, one sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached. State v. Macon, 57 N.J. 325, 335-336 (1971). Or, as stated in Fahy v. Connecticut, 375 U.S. 85, 86-87, 84 S.Ct. [229], 230 11 L.Ed.2d 171, 173 (1963), "The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction."
Initially, defense counsel opened the door to this line of testimony. On cross-examination of Detective Moran defense counsel queried:
Now, Officer. then it is fair to say that at the time you did this photographic identification you already had in your mind that one of the perpetrators, somebody of the perpetrators of this crime was Larry Douglas; isn't that so?
In response, the detective stated that "[o]ne of the other perpetrators told us that the person involved was Larry." Defendant did not request that the response be stricken.
No objection was made by defense counsel to the line of questioning by the prosecutor in his direct examination of Officer Gallagher. The objection came during the summation of the prosecutor when defense counsel's objection to the hearsay testimony was sustained and the jury was admonished to disregard reference to the statement. Again, in his final charge the court reminded the jury to disregard the prosecutor's comment.
*274 Under R. 1:7-2 an objection to a question or line of questions is essential to reserve questions for review. This requirement provides the trial court with the opportunity to take corrective action wherever necessary to reduce the impact of the improper questioning. See State v. Bucanis, 26 N.J. 45, 57, cert. den. 357 U.S. 910, 78 S.Ct. 1157, 2 L.Ed.2d 1160 (1958). The purpose of the requirement for a timely objection is particularly apparent from the circumstances of this case. Had a timely objection been made, the inadmissible testimony would have been "subject to repair by the trial court's curative instruction." State v. Winter, 96 N.J. 640, 648-649 (1984). Under these circumstances where the errors were invited or induced by defense counsel they will not serve as a basis for reversal on appeal. Further, we find that the errors did not plainly impair the integrity of the proceedings. See State v. Simon, 79 N.J. 191, 204-205 (1979); State v. Bishop, 187 N.J. Super. 187, 194-195 (App.Div. 1982).
In view of the positive identification, both out-of-court and in-court, of defendant by the witness Totaro which clearly linked him with the robbery, as well as defendant's possession of the weapon used in the robbery, we do not deem as a real possibility that the hearsay evidence led to an unjust verdict. Nor was it sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached. There was substantial credible evidence upon which the jury could predicate its finding of guilt without any hearsay testimony. We therefore find that the hearsay evidence did not prejudice a substantial right of the defendant and is therefore harmless.
In Bankston, the State's case was very weak and the prosecutor attempted to bolster the State's case by referring to the prior investigation of the police. Bankston 63 N.J. at 272. In Manning, it was the State's burden to connect defendant with a juvenile and a robbery. It could not call the juvenile as a witness because he recanted at a voir dire hearing and testified *275 that defendant had nothing to do with the robbery or with the juvenile being at the scene. The inculpatory statement by the juvenile was the strongest link between the defendant and the robbery. The Supreme Court in a four to three decision held that the curative instructions were insufficient to neutralize as prejudicial testimony. State v. Manning, supra, 82 N.J. at 421-422. In State v. Thomas, supra, the reversal was based, not only upon the hearsay testimony but also upon at least four other critical errors precipitated by the prosecutor which were determined to be "indefensible."
In Bankston, Manning and Thomas the hearsay testimony was prejudicial to defendant because of the weakness of the State's case. Here, the State's case is fortified by direct positive evidence of identification leading to the arrest of defendant and recovery of the revolver.
Next, defendant contends that the denial of his motion to suppress as an item of evidence the revolver discovered in the course of the consent search is reversible error. Initially, he contends that the State failed to prove that Mrs. Douglas had authority to consent to the search of defendant's bedroom. This issue was not raised before the trial court. He also contends that the State failed to prove that Mrs. Douglas freely and voluntarily consented to the search of her apartment. We reject both of these contentions.
Preliminarily, we are again disturbed that the issue of the lack of authority of defendant's mother to search the bedroom is presented to the court for the first time on appeal. This is particularly disquieting in the present matter because there is a dearth of facts in the voir dire hearing concerning the occupancy by defendant of his mother's apartment, the relationship between defendant his mother and the arrangement between them concerning the defendant's occupancy of the bedroom which was searched.
The Fourth Amendment proscription of unreasonable searches and seizures prohibits warrantless searches with certain *276 exceptions. State v. Miller, 159 N.J. Super. 552, 556 (App. Div.), certif. den. 78 N.J. 329 (1978). One exception is that where a valid consent is given a search may be conducted without a warrant and without probable cause. United States v. Matlock, 415 U.S. 164, 165, 94 S.Ct. 988, 990, 39 L.Ed.2d 242 (1974); Schneckloth v. Bustamonte, 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973); Vale v. Louisiana, 399 U.S. 30, 35, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970); Katz v. United States, 389 U.S. 347, 358, 88 S.Ct. 507, 515, 19 L.Ed.2d 576 (1967). A valid consent may be obtained from one other than the accused, i.e., from a third party, so long as the consenting third party has the authority to bind the accused. See State v. Miller, 159 N.J. Super. at 558-559.
State v. Miller involved the consent search of two rooms in a rooming house where defendant resided with his cousin and his accomplice. There, as here, the crime weapon was found under the defendant's bed. Defendant's cousin (the accomplice's girlfriend), consented to the search and admitted the police to the rooms. On appeal, defendant contended that his cousin's consent was invalid. However, the cousin's possession of the keys to the room, coupled with her representation to the police that she resided in both rooms with defendant's accomplice, convinced the court that she possessed the common authority contemplated in Matlock, and the search was upheld. State v. Miller, supra, 159 N.J. Super. at 555-558.
To determine whether a valid consent to search an area was given by a third party the State must first prove that the consent was freely and voluntarily given. Schneckloth 412 U.S. at 248-249, 93 S.Ct. at 2058-59; State v. Johnson, 68 N.J. 349, 353-354 (1975). Further, the State must prove that the consent to search was obtained from a person who possessed a sufficient relationship with the property searched or the defendant. It must be shown that the third party possessed common authority over or other sufficient relationship to the premises or the effects sought to be inspected. Matlock at 168-170. It *277 has been noted that "Matlock stressed two bases for the `common authority' rule: (i) that the consenting party could permit the search `in his own right'; and (ii) that the defendant had `assumed the risk' that a co-occupant might permit a search." 2 LaFave, Search and Seizure at 698 (1978). Three rationales which have been suggested to justify third party consents are:
(1) Implied agency  the court will imply, under certain circumstances, an agency relationship which supports the consent.
(2) Status relationship  the relationship between the parties (e.g., husband and wife) gives one party the right to consent for the other.
(3) Possession and control  a person whose rights of possession and control over the premises or property that are equal or superior to those of the suspect may consent to a search. [Wefing and Miles, "Consent Searches and the Fourth Amendment: Voluntariness and third party problems," 5 Seton Hall L.Rev. 211, 253 (1974)].
In order to sustain its burden of proof concerning consent to search, the State is required to prove voluntariness by clear and positive testimony. State v. King, 44 N.J. 346, 352 (1965); Schneckloth, 412 U.S. at 222, 93 S.Ct. at 2045. While the State need not prove that the third person was informed of a right to refuse consent, Schneckloth at 248-249, 93 S.Ct. at 2058-59, Johnson, 68 N.J. at 354, the State has the burden of demonstrating knowledge on the part of the third party that he had a choice in the matter. Johnson at 354.
Further, it need not be shown that the defendant was inaccessible for a third party's consent to be sufficient. LaFave, supra, § 8.3 at 710-711. As pointed out by Professor LaFave, in Matlock, while the defendant was arrested in the front yard of the searched premises, and the officers were aware at the time of the arrest that he lived in the house, they did not ask him which room he occupied or whether he would consent to a search. Id. at 711. Moreover, where, as here, the occupant requests that no such consent be given by the co-occupant, a search may still be effective. Id. at 704, citing United States v. Sumlin, 567 F.2d 684 (6 Cir.1977); Scott William K. v. Fare, 75 Cal. App.3d 162, 142 Cal. Rptr. 61 (Dist.Ct.App. *278 1977). However, a protected expectation of privacy may exist where a defendant has taken some special steps to protect his personal affects from the scrutiny of others, LaFave supra, at 715, citing Holzhey v. United States, 223 F.2d 823 (5 Cir.1955), but does not unquestionably exist where the co-occupant has ready access to the place searched. Ibid., citing United States v. Richardson, 562 F.2d 476 (7 Cir.1977); White v. United States, 444 F.2d 724 (10 Cir.1971).
People v. Nunn, 55 Ill.2d 344, 304 N.E.2d 81 (Sup.Ct. 1973), relied upon by defendant is an example of a protected expectation of privacy. There, the court applied a subjective expectation of privacy test where defendant left the home two weeks earlier after locking the door to his bedroom, telling his mother not to enter and instructing her not to allow anyone else to enter. The mother did not apparently have a key to the room because the police gained entry with a pass key. However, since the adoption of the "common authority" test adopted by the United State Supreme Court in United States v. Matlock, supra, the Illinois Supreme Court has repudiated the subjective expectation privacy test which it had adopted in Nunn and adopted the common authority test of Matlock. In People v. Stacey, 58 Ill.2d 83, 317 N.E.2d 24, 27 (Sup.Ct. 1974), the court stated: "We therefore find that the defendant's subjective `expectation of privacy' is irrelevant and the validity of the search in this case is to be judged by the more objective `common authority' test of Matlock." Subsequent Illinois cases have rejected the holding in Nunn, e.g., In The Interest of Salyer, 44 Ill. App.3d 854, 358 N.E.2d 1333 (Ill. App.Ct. 1977) (son kept a combination lock on the outside of the room and also a lock inside; mother gained entrance only by knocking; son cleaned his own room, and delivered his laundry to his mother. Consent search by mother upheld).
As to the particular circumstances concerning the consent by a parent to search the room of a child residing in the parents home, the overwhelming majority of the cases uphold the right of the parent to consent to a search of the son or daughter's *279 room. LaFave, supra, § 8.4 at 731 and see text, 731 to 735. See Annotation, "Admissibility of evidence discovered in search of defendant's property or residence authorized by defendant's adult relative other than spouse  state cases", 4 A.L.R.4th 196, 211 (1981). The consent to a warrantless search by a parent for evidence to be used against the child is based on the parent's authority as head of the household or owner of the property, ibid, as an exercise of parental authority over the minor, id. at 214, or as a co-tenant or common resident. Id. at 215. Cases involving the particular search of the child's room are collected, analyzed, collated and categorized as being held admissible, id. at 222 or inadmissible. Id. at 234. Thirty-five cases from 22 States upholding the admissibility of evidence on the consent search by a parent of a child's room are factually analyzed. Id. at 222 to 234.
On the other hand, only eight cases from six states (some of which are classified above) hold that the evidence seized as a result of a parent's consent to search the child's room is inadmissible. Id. at 234 to 238. However, for the most part, the latter cases are distinguishable. In In re Scott K., 24 Cal.3d 395, 155 Cal. Rptr. 671, 595 P.2d 105 (Sup.Ct. 1979), cert. den. 444 U.S. 973, 100 S.Ct. 468, 62 L.Ed.2d 388 (1979), the warrantless search of a tool box in the defendant's bedroom was held inadmissible and in People v. Egan, 250 Cal. App.2d 433, 58 Cal. Rptr. 627 (Dist.Ct. 1967), a pistol discovered in a kit bag found in defendant's closet was inadmissible. In People v. Daniels, 16 Cal. App.3d 36, 93 Cal. Rptr. 628 (Dist.Ct. 1971), while the mother was authorized to consent to a search of the defendant's bedroom she had no authority to consent to the search of his suitcase located in the bedroom. People v. Nunn, 55 Ill.2d 344, 304 N.E.2d 81 (Sup.Ct. 1973), cert. den. 416 U.S. 904, 94 S.Ct. 1608, 40 L.Ed.2d 108 (1974) has since been overruled by the Illinois Supreme Court. In People v. Flowers, 23 Mich. App. 523, 179 N.W.2d 56 (Mich. Ct. App. 1970), the Michigan Court held that only the accused could waive his constitutional rights. In State v. Peterson, 525 S.W.2d 599 (Mo. App. *280 1975), the son was in his room under an arrest warrant when apprehended and taken away. Evidence revealed that the room was the exclusive area of defendant's and that no one else had a right to be in the room. In People v. Mortimer, 46 App.Div. 2d 275, 361 N.Y.S.2d 955 (Sup.Ct.N.Y. 1974) the consent of the parent to search defendant's bedroom was obtained after defendant had expressly denied the police permission to search the room.
There is no question but that the State complied in all respects with the requirements hereinbefore cited as a condition for the admission of the revolver into evidence on the basis of a consent search by defendant's mother. In addition to the facts as previously stated concerning the search, the consent to search form, which was admitted and read into evidence at the hearing, authorized the police to conduct a complete search of Mrs. Douglas' apartment and "to take from my premises any letters, papers, material or other property which they may desire." The form contained an acknowledgement by Mrs. Douglas that her consent was voluntary, and had been obtained without threats or promises of any kind; that she had been informed of her constitutional right to preclude the warrantless search of her apartment, and her right to refuse to consent to the search. Further, in view of the fact that the bedroom did not even have a door to separate it from the remainder of the apartment, there certainly could be no "expectation of privacy."
Next, defendant contends that the trial judge committed reversible error when he failed, sua sponte, to reconsider his ruling on the motion to suppress in light of testimony elicited during trial. Again, this issue was not raised before the trial court. We find that this issue is clearly without merit. R. 2:11-3(e)(2). Officer Gallagher, who signed as a witness to the consent to search form, did not give an affirmative contradictory statement concerning the signing by Mrs. Douglas of the consent to search. He merely gave a negative statement that he did not recall whether he was present when Mrs. *281 Douglas signed her name. Nevertheless, he did testify that he heard Mrs. Douglas give her oral consent. Further, his statement that he never heard defendant give his oral consent is a negative statement and not a contradiction of the statement of Officer DeLeva that defendant gave his verbal consent to search. Moreover, as indicated above, the consent or lack of consent of defendant is not relevant on the consent of his mother to search the apartment.
Lastly, defendant contends that his sentence for an indeterminate term not to exceed 20 years for the armed robbery conviction and a concurrent indeterminate term not to exceed five years for the unlawful possession of a gun conviction is excessive. The contention that excessiveness on the basis that the sentences are consecutive to an indeterminate term not to exceed ten years for which the defendant was already serving is totally irrelevant. His contention that the trial judge failed to take into account the fact that he was 21 or 22 years of age at the time of sentencing is rejected. He was sentenced to the Youth Correctional Institute complex because of his age for rehabilitation and development of vocation skills. Both sentences were within the sentencing range prescribed by the statutes. The defendant could have been sentenced to a determinate term with a minimum parole ineligibility.
In imposing sentence the trial judge took into account defendant's prior record which included an indictable adult conviction; the gravity and violence of the crime committed; the need to deter defendant and others from future violations of the law, and the serious physical harm inflicted upon the victim, Michael Totaro. N.J.S.A. 2C:44-1a.(1), (2), (6) and (9).
In State v. Roth, 95 N.J. 334 (1984) and State v. Hodge, 95 N.J. 369 (1984), the Supreme Court for the first time prescribed standards to guide sentencing courts and appellate courts under the Code of Criminal Justice. Under the guidelines set down in Roth, an appellate court can "(a) review sentences to determine if the legislative policies ... were violated; (b) review *282 the aggravating and mitigating factors found below to determine whether those factors were based upon competent credible evidence in the record; and (c) determine whether, even the Court sentenced in accordance with the guidelines, nevertheless the application of the guidelines to the facts of the case make the sentence clearly unreasonable so as to shock the judicial conscience." Roth at 364-365.
Substitution of the appellate tribunal's judgment over that of the trial court is to be avoided. The goal is not a difference in judgment. The error which warrants modification of a sentence must amount to more than a difference of opinion of individual sentencing philosophy. It is deviation from those objectives, in view of the standards and criteria therein set forth, which constitutes error. Id. at 365.
Affirmed.
NOTES
[1] Defendant was sentenced two months prior to the Graves Act, N.J.S.A. 2C:43-6(c) and 6.1, requiring a mandatory minimum sentence for crimes involving possession of a firearm.
[1a] Mrs. Douglas died prior to the hearing.