**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4829-18

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

FREDERICK OWLE, a/k/a
FREDERICK OWLE JR.,
FREDRICK OWLE, and
CHIEF,

      Defendant-Appellant.

_____

Argued May 11, 2022 – Decided June 20, 2022

Before Judges Hoffman, Whipple, and Susswein.

On appeal from the Superior Court of New Jersey, Law Division, Burlington County, Indictment No. 17-07-0728.

Stefan Van Jura, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Stefan Van Jura, of counsel and on the brief).

Alexis R. Agre, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause

for respondent (LaChia L. Bradshaw, Acting Burlington County Prosecutor, attorney; Alexis R. Agre, of counsel and on the brief).

Appellant filed a supplemental pro se brief.

PER CURIAM

Defendant appeals from his jury trial convictions for two armed robberies and related weapons offenses. He contends for the first time on appeal that (1) his rights under the Sixth Amendment Confrontation Clause were violated by the admission of hearsay testimony explaining how police initially identified him as a suspect, and (2) the trial court erred by failing to properly instruct the jury concerning out-of-court eyewitness identifications. Defendant further argues in a pro se supplemental brief that the prosecutor committed misconduct during both the charging process and at trial, and that the mandatory sentence of life imprisonment without parole imposed pursuant to the "Three Strikes Law," N.J.S.A. 2C:43-7.1, is illegal.

The prosecution hinged on proving the identity of the robber, which was contested at trial. The defense argued that police prematurely focused on defendant to the exclusion of the true culprit. The critical issue raised on appeal requires us to determine whether the State improperly introduced and commented upon inadmissible testimony concerning the initial stage of the

2

police investigation. After carefully reviewing the record in view of the governing precedents, we conclude that inadmissible hearsay testimony elicited from two police witnesses concerning how defendant was first identified as a suspect created an impermissible inference that police possessed incriminating evidence that was not introduced at trial. The harm resulting from those repeated Confrontation Clause violations was compounded by the prosecutor's reference to the inadmissible hearsay in his opening argument when he told the jury that "other people," referring to non-testifying sources, told police "it's possibly this individual named Freddie Owle."

The prosecution, it bears noting, introduced substantial <u>admissible</u> evidence of defendant's guilt. The State's case was not so overwhelming, however, as to overcome the potential impact of the Confrontation Clause violations on the final verdict. We are thus unable "to declare a belief that [the constitutional error] was harmless beyond a reasonable doubt." <u>See</u> <u>State v. Weaver</u>, 219 N.J. 131, 154 (2014) (quoting <u>Chapman v. California</u>, 386 U.S. 18, 24 (1965)). We are therefore constrained to reverse defendant's convictions and remand the case for a new trial.

A-4829-18

I.

We discern from the record the following facts that are pertinent to the issues raised on appeal. On April 14, 2017, the Wawa convenience store (Wawa) on Route 130 in Florence Township was robbed. At approximately 11:30 p.m., Wawa employee Tracy Craft was working at the cash register when a "middle-aged white male approached" her and asked for a pack of Newport cigarettes. He wore a "gray jacket with a blue or black hat" and gloves. Ms. Craft turned around, as the cigarettes were located behind her, grabbed them and gave them to the man. The man then "leaned over the counter with the knife in his hand and said, 'and everything in the register.'" Ms. Craft said, "excuse me?" and the man said again, "everything in the register." Craft immediately "got on [her] radio and started calling to the other associates who had radios to help, we were being robbed."

Celenia Rivera, the Wawa "college graduate leader," was working in the office when she heard Craft's radio call. Ms. Rivera ran out of the office and saw Craft pointing at the perpetrator, who was walking toward the exit. Rivera followed the man into the vestibule. Defendant, who was already outside the vestibule, turned around and lunged toward Rivera with the knife. Rivera got

scared and closed the vestibule door. She locked the door and instructed all customers to stay inside while she called the police.

Sergeant Nicholas Czepiel of the Florence Township Police Department responded to the Wawa at approximately 11:44 p.m. and spoke to Craft and Rivera. Rivera described the robber as a "white guy with a beard" who was "possibly Hispanic" wearing a "black wool cap, a gray zip-up hooded sweatshirt with [a] black zipper and black drawstrings to it, black T-shirt, black pants and white sneakers. And male with facial hair." Rivera also told police that the robber had "the bluest eyes I've ever seen."

Customers arriving at the Wawa informed Sergeant Czepiel that another robbery had just taken place at a nearby Valero gas station (Valero). He immediately went to Valero and spoke with the two attendants.

Surendra Vasisht, one of the Valero attendants, testified that at approximately 11:50 p.m., a man came into the gas station "cabin" where Vasisht and the other attendant were doing paperwork. The man brandished a "shiny" metal rod with a "black handle" that was approximately "two to three feet" long. He wore a "grayish hoodie," black or "dark-colored" pants, white sneakers and gloves, and his face was covered, so only his eyes could be seen.

5

Vasisht estimated that the man was forty years old and between five feet seven and five feet nine inches tall.

The robber told the two attendants to "put everything on the table" or "I'll kill you" or "I'll beat you." According to Vasisht, the robber also threatened to shoot them, but Vasisht did not see a gun. The men put approximately $530 in cash on the table. The robber grabbed the cash and fled on foot toward Route 130 South. Vasisht immediately called the police and Sergeant Czepiel arrived at Valero "within five minutes."

Both robberies were captured on security video from the Wawa and Valero. The surveillance video recordings were played for the jury at trial. Detective Christopher Powell of the Florence Township Police Department, who viewed the security videos on the night of the robberies, testified at trial that "the same subject [was] responsible for both robberies," because the man in the videos was "wearing the same exact clothing in both." Valero video depicted the suspect leaving the gas station on foot and turning left near the fence line. Powell testified that the video shows that "several moments" after the robber walked down the fence line, a vehicle entered the frame, travelled up the long driveway of the neighboring Burlington Coat Factory offices, and made a left turn southbound on Route 130.

6

Because the robber had fled Valero on foot, Sergeant Czepiel called for a canine tracker. Bordentown Township Police Officer Richard Brettell responded with his bloodhound, Liberty. Officer Brettell testified that Liberty followed a scent trail south on Route 130 from Valero to the parking lot of the Budget Inn, at which point the dog lost the trail.

Shortly after the robberies, Sergeant Czepiel obtained the name of a possible suspect, not defendant, who stayed at the Budget Inn. Czepiel and two other officers went to the Budget Inn and spoke with the possible suspect, Matthew Haines, and his wife.[1] Mr. Haines appeared to have just "awoken from a deep sleep" and was wearing only a "T-shirt and his underwear." Czepiel testified that he discounted Mr. Haines as a suspect because he did not fit the description in that he "did not have any facial hair" and he had a "very pale" not "tan" skin tone. Also, Mr. Haines walked "hunched over" and appeared to have a back injury.

Czepiel described the robber to the Haines. Czepiel testified at trial that Mrs. Haines "then made a statement that she has an idea of who she believed the

_____

[1] The record is not clear whether she was Matthew Haines' wife or girlfriend. Nor does the record reflect her name, although her role in the investigation is critical to the Confrontation Clause issue before us. We refer to her as "Mrs. Haines." She did not testify at trial.

suspect was." She specified a man nicknamed "Chief" and told police his real name was "Fred Owle" and that he also resided at the Budget Inn. After obtaining defendant's room number from the front desk, the officers went to defendant's room and encountered his girlfriend, Angela Petroski. Defendant was not there, and Petroski told the officers that he was in another specific room.

Sergeant Czepiel and other officers went to that room. Fred Deloise answered the door. Czepiel discounted Deloise as a suspect as he was "very pale," had no facial hair and was heavier than the robber seen in the surveillance video. Deloise initially denied that defendant was in the room, but eventually admitted that he was and allowed the officers to enter. Defendant was wearing a "black T-shirt, shorts and white sneakers" and was holding a pack of Newport cigarettes.

While canvassing the parking lot of the Budget Inn, Detective Powell observed a 2004 green Ford Taurus registered to Petroski. Powell and Czepiel observed through the car window a two-foot-long metal pipe and a black wool cap with an Eagles emblem. The car was impounded, towed, and searched pursuant to a warrant. Police recovered the pipe and cap. Nothing else of evidential value was found in the car.

A-4829-18

Vasisht testified at trial that the pipe used by the robber to threaten him and his co-worker was "like" the metal pipe found in the Taurus, which he recognized by "the black handle." There is no indication in the record that Vasisht was ever asked to make an out-of-court identification of the robber. Furthermore, when Vasisht was asked at trial whether he could recognize the individual who came into the gas station that night, he testified that he could not.

The State did not present testimony from the other Valero attendant, Sankar Singh. Nor does the record reflect that Singh participated in a photo-array or other out-of-court identification procedure.

Ms. Craft testified that she went to the police station on the night of the robbery to provide a formal statement. Although she gave a description of the robber, the record does not indicate that she was ever asked to identify the culprit in an out-of-court identification procedure. At trial, she acknowledged that she could not remember any distinguishing characteristics of the robber because she "blacked out" from fear. She nonetheless identified defendant at trial as the person who robbed the Wawa.

Ms. Rivera went to the Florence Township Police Station at approximately 6:00 or 7:00 a.m. on April 15, 2017, after her night shift at the Wawa ended.

9

Lieutenant I. Albert Jacoby had prepared a photo array that included photographs of defendant and five other men.[2] Lieutenant Jacoby testified at trial that Sergeant Czepiel and Detective Powell had "briefed [him] on the case," "indicated they [had] developed a suspect [defendant,]" and requested assistance with a photo array. Lieutenant Jacoby testified that he chose photos for the array "resembl[ing] the suspect in characteristics that were [developed] both by the description given by the witnesses and by any other investigative means that we have had." Florence Township Detective Nicole Bonilla, who had no other involvement in the case, showed the photos in the array to Rivera sequentially. Rivera positively identified the photograph of defendant as depicting the man who robbed the Wawa. She also identified defendant at trial.

Three days after the robbery, Detective Powell canvassed the area around Valero where the video depicted the suspect running. He found a black ski mask in the woods near the gas station. The State presented expert testimony from a New Jersey State Police forensic scientist that established to a reasonable degree of scientific certainty that defendant's DNA was found on the ski mask.

_____

[2] So far as the record before us indicates, there was no <u>Wade</u> hearing in this case, nor was there a request by defendant for such a hearing. <u>See</u> <u>United States v. Wade</u>, 388 U.S. 218 (1967).

On July 6, 2017, a Burlington County grand jury indicted defendant for three counts of first-degree robbery, N.J.S.A. 2C:15-1(a)(2) (counts one through three); third-degree possession of a weapon (knife) for an unlawful purpose, N.J.S.A. 2C:39-4(d) (count four); third-degree possession of a weapon (metal pipe) for an unlawful purpose, N.J.S.A. 2C:39-4(d) (count five); fourth-degree unlawful possession of a weapon (knife), N.J.S.A. 2C:39-5(d) (count six); and fourth-degree unlawful possession of a weapon (metal pipe), N.J.S.A. 2C:39-5(d) (count seven).

Prior to trial, the court granted the State's application to dismiss count three. In January 2019, defendant was tried before a jury on the remaining counts over the course of five non-consecutive days. At trial, both Craft and Rivera identified defendant as the man who had committed the Wawa robbery. Rivera also testified regarding how she identified defendant from the photo array that was administered on the morning after the robbery. We deem it significant to highlight that defendant does not have blue eyes, as Rivera had initially told police. Rather, he has brown eyes. The State presented no witnesses who could identify defendant as the person who committed the Valero robbery.

During its deliberations, the jury asked to see the video surveillance recordings from both robberies. The jury also asked to hear a playback of

11

Sergeant Czepiel's testimony. The jury ultimately convicted defendant of all remaining charges.

The sentencing hearing was conducted on April 17, 2019. On count one, first-degree robbery at the Wawa, defendant was sentenced pursuant to N.J.S.A. 2C:43-7.1 to a mandatory term of life imprisonment without parole. The court merged defendant's convictions on count four, possession of a weapon (knife) for an unlawful purpose, and count six, unlawful possession of a weapon (knife), with his conviction on count one. The court further merged defendant's convictions on count five, possession of a weapon (metal pipe) for an unlawful purpose, and count six, unlawful possession of a weapon (metal pipe), with his conviction on count two, first-degree robbery of the Valero gas station. On this second robbery conviction, the judge imposed a concurrent prison term of seventeen years subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.

This appeal followed.

Defendant raises the following contentions for our consideration in the brief submitted on his behalf by counsel:

> POINT I
>
> DEFENDANT WAS DENIED HIS RIGHTS TO CONFRONTATION AND A FAIR TRIAL BY

TESTIMONY AND ARGUMENT CREATING AN INESCAPABLE INFERENCE THAT THE POLICE POSSESSED EXTRA-RECORD EVIDENCE OF DEFENDANT'S GUILT. U.S. CONST. amends. V, VI, and XIV; N.J. CONST. art. I, ¶ 1, 9, and 10. (Not Raised Below)

POINT II

DEFENDANT WAS DENIED DUE PROCESS AND A FAIR TRIAL BY A FAULTY IDENTIFICATION JURY CHARGE THAT FAILED TO PROVIDE THE JURY WITH ANY GUIDANCE ON HOW TO ASSESS THE PHOTOGRAPHIC IDENTIFICATION PROCEDURE, WHICH WAS THE LYNCHPIN IN THE STATE'S CASE. U.S. CONST. amends. V and XIV; N.J. CONST. art. I, ¶ 1, ,9, and 10. (Not Raised Below).

Defendant additionally raises the following contentions in his pro se supplemental brief:

POINT I

CONTRARY TO THE PROSECUTOR'S STATEMENT THAT "IT'S NOT A CONSPIRACY TO TRY TO GAIN WRONGFUL CONVICTIONS," THIS CASE PRESENTS THAT DEFENDANT'S DUE RIGHTS PROCESS RIGHTS AND OTHER CONSTITUTIONAL RIGHTS [WERE] VIOLATED ON THE BASIS OF BAD FAITH, [CONNIVANCE] ON THE PART OF THE GOVERNMENT, BY PROSECUTORIAL MISCONDUCT, [WHOSE] CHARGING PROCESS AND DECISIONS RETURNED [AN] INVALID INDICTMENT THAT WAS NOT RETURNED IN OPEN COURT BEFORE THE "ASSIGNMENT JUDGE," R. 3:6-9(b), WAS

13

A-4829-18

NOT FILED AT THE TRIAL COURT, NOR ENDORSED AS A "TRUE BILL" BY THE FOREPERSON OF EITHER THE STATE OR [BURLINGTON] COUNTY GRAND JURY, MEANING APPELLANT IS IN CUSTODY DUE TO THE PROSECUTOR[']S VIOLATION [OF] BOTH ARTICLE I, ¶ 8 OF THE NEW JERSEY CONSTITUTION AND AMENDMENT V OF THE UNITED STATES CONSTITUTION. AS A RESULT[,] BURLINGTON COUNTY PROSECUTED THE CAUSE WITHOUT THE TRIAL COURT HAVING JURISDICTION ON THIS CASE. THE PROSECUTOR'S [SUMMATION] DIRECTS TO [CELENIA] RIVERA WHO ON CROSS[-EXAMINATION] RECANTED HER PRIOR TESTIMONY BECAUSE DEFENDANT DID NOT HAVE BLUE EYES BUT RATHER BROWN EYES, AS HE IS A "NATIVE AMERICAN[,]" A CLEAR MISTAKEN IDENTIFICATION CASE. ALL OF THIS WAS SO EGREGIOUS THAT IT CLEARLY AND UNMISTAKENLY DEPRIVED . . . DEFENDANT A FAIR TRIAL REQUIRING [HIS] CONVICTION BE VACATED AND REVERSED. (Not Raised Below).

POINT II

THE SENTENCE AS A WHOLE IMPOSED "CRUEL AND UNUSUAL PUNISHMENT [HAS BEEN] INFLICTED," [sic] U.S. CONST. amend. VIII; N.J. CONST. art. I, ¶ 12, [THE JUDGE][,] DID NOT "STATE THE FACTUAL AND LEGAL BASIS SUPPORTING HIS IMPOSITION OF SENTENCE," N.J.S.A. 2C:43-2[8], CAUSING AN ILLEGAL SENTENCE OF "LIFE[,]" . . . "85%" AS ARBITRARILY IMPOSED, MITIGATING FACTORS NOW [OUTWEIGH] THE AGGRAVATING FACTORS TO DROP BY ONE

14

DEGREE THE ROBBERY CRIMES, REQUIRES APPELLATE REVIEW TO MODIFY THE CONVICTION PURSUANT TO N.J.S.A. 2C:44-7, THE CONVICTION MUST BE REVERSED, OVERTURNED AND VACATED[.] (Partially raised below).

## II.

We first address defendant's contention, raised for the first time on appeal as plain error,[3] that his convictions should be reversed because of testimony of Sergeant Czepiel and Lieutenant Jacoby, as well as the prosecutor's opening statement. Defendant asserts that the testimony and opening statement impermissibly created the inference that police were aware of incriminating evidence provided by non-testifying witnesses, thereby violating his rights under the Confrontation Clause of the federal and state constitutions. We begin our analysis by surveying the Confrontation Clause precedents that dictate the outcome of this appeal.

---

[3] We reject the State's contention that defendant is procedurally barred from asserting the Confrontation Clause claim on appeal because he did not raise it to the trial court and did not make a timely objection to the testimony on hearsay grounds. See R. 2:10-2; see also Hemphill, 142 S. Ct. 694 (Alito, J., concurring) (recognizing that a defendant may validly waive Sixth Amendment right to confront witnesses). We elect to review defendant's constitutional argument on the merits applying the plain error standard of review.

15

As the United States Supreme Court recently reaffirmed, "[o]ne of the bedrock constitutional protections afforded to criminal defendants is the Confrontation Clause of the Sixth Amendment . . . ." Hemphill v. New York, 142 S. Ct. 681, 690 (2022). The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const. amend. VI. The New Jersey Constitution's analogue to the Sixth Amendment, Article I, paragraph 10, "provide[s] equivalent protection." State v. Roach, 219 N.J. 58, 74 (2014). "Our confrontation jurisprudence 'traditionally has relied on federal case law to ensure that the two provisions provide equivalent protection.'" State v. Sims, 250 N.J. 189, 223 (2022).

The United States Supreme Court has held that "the framers of the Constitution intended the Confrontation Clause to bar the admission of 'testimonial statements of a witness who did not appear at trial unless [the declarant is] unavailable to testify, and the defendant had . . . a prior opportunity for cross-examination.'" Ibid. (alteration in original) (quoting Crawford v. Washington, 541 U.S. 36, 53–54 (2004)). Importantly, "[t]he Confrontation Clause applies to 'witnesses against the accused,' or those who 'bear testimony,' which is a 'solemn declaration or affirmation made for the purpose of

A-4829-18

establishing or proving some fact.'" State v. Carrion, 249 N.J. 253, 268 (2021) (citing Crawford, 541 U.S. at 51). A "central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." Maryland v. Craig, 497 U.S. 836, 845 (1990).

The right to confront witnesses is "an essential attribute of the right to a fair trial" as it "secures for a defendant the 'fair opportunity to defend against the State's accusations . . . .'" State v. Medina, 242 N.J. 397, 412 (2020) (first quoting State v. Branch, 182 N.J. 338, 348 (2005); and then quoting State v. Garron, 177 N.J. 147, 169 (2003)). "[B]oth the Confrontation Clause and the hearsay rule are violated when, at trial, a police officer conveys, directly or by inference, information from a non-testifying declarant to incriminate the defendant in the crime charged." Branch, 182 N.J. at 350 (citing State v. Bankston, 63 N.J. 263, 268–69 (1973)).

Our Supreme Court's frequently cited decision in Bankston lays the foundation for our analysis. In that case, police officers entered a tavern and found drugs near where the defendant was sitting. Bankston, 63 N.J. at 265. The defendant was subsequently arrested. Id. at 265–66. At trial, one of the

detectives testified that the defendant fit an informant's description of a person with drugs in the tavern.  Id. at 266.  The Court noted that

> [i]t is well settled that the hearsay rule is not violated when a police officer explains the reason he [or she] approached a suspect or went to the scene of the crime by stating that he [or she] did so "upon information received."  Such testimony has been held to be admissible to show that the officer was not acting in an arbitrary manner or to explain his [or her] subsequent conduct.  However, when the officer becomes more specific by repeating what some other person told him [or her] concerning a crime by the accused the testimony violates the hearsay rule.
>
> [Id. at 268 (citations omitted).]

The Court determined that the detective's testimony was inadmissible hearsay.  "Although . . . the [detective] never specifically repeated what the inform[ant] had [said], the inescapable inference from [the] testimony was that the inform[ant] had given information that defendant would have narcotics in his possession."  Id. at 271.  As a result, "the jury was led to believe that an unidentified inform[ant], who was not present in court and not subjected to cross-examination, had told the officers that defendant was committing a crime.  The testimony was clearly hearsay."  Ibid.

The Court in State v. Irving provided further guidance not only on when hearsay testimony constitutes a Confrontation Clause violation but also on when

A-4829-18

any such violation constitutes reversible error.  114 N.J. 427, 446–47 (1989).  In that case, three armed men robbed a luncheonette in Newark.  Id. at 431.  The proprietor was shot and wounded in the course of the robbery.  Ibid.  A detective testified that he focused on Irving as the subject of the investigation and placed his picture in the array after going to the neighborhood and asking for leads.  Ibid.  The Court concluded that the inescapable inference from that trial testimony, although never specifically stated, was that an informant had told the detective that the defendant committed the crime.  Id. at 446.  The Court acknowledged that in Bankston, the officer had testified more specifically on the information provided by the informant.  The Irving Court reasoned, however, that the creation of the inference, not the specificity of the statements made, was the critical factor in determining whether the hearsay rule was violated.  Id. at 447.

The Court ultimately distinguished Bankston because the defense counsel in Bankston had made a timely objection to each testimonial impropriety, thus preserving the issue for appeal.  Ibid.  By contrast, in Irving, the defense counsel did not object to the detective's hearsay testimony, even though the same testimony had been given at the Wade hearing prior to trial.  Ibid.

19

The Court noted that because the issue was to be resolved under the plain error standard of review, it must consider whether there is reasonable doubt that the jury would have ruled other than as it did. Ibid. The Court cited and relied upon our then-recent decision in State v. Douglas, 204 N.J. Super. 265 (App. Div. 1985), where the defense attorney failed to make a timely objection to the prosecutor's remarks in summation regarding an officer's testimony explaining why the defendant's picture had been placed in a photo array. Irving, 114 N.J. at 446–47. The court in Douglas surveyed the relevant precedents and determined that in those earlier cases, hearsay testimony was deemed to be prejudicial because the State's cases were "very weak . . . ." 204 N.J. Super. at 275. The Douglas panel concluded that because the State's proofs in the matter before it were "fortified by direct positive evidence"—for example, direct identification of the defendant—the hearsay testimony was not prejudicial under the plain error rule. Ibid.

Applying that principle to the totality of the proofs in the record, the Supreme Court in Irving concluded that a reasonable doubt was not raised on whether the hearsay led the jury to a result it otherwise might not have reached. 114 N.J. at 448. In reaching that fact-sensitive conclusion, the Court succinctly summarized the independent proofs of guilt:

A-4829-18

In this case, two eyewitnesses identified the defendant both in court and out of court. Defendant's time slips indicated that the only day he arrived late to work during a four week period was on the date of the robbery. The only day he missed work during this period was the day before the robbery, the same day that his accomplice, co-defendant Livingston, was seen parked on the street a distance away from Frisco's Luncheonette. Under those circumstances we do not find that a reasonable doubt is raised on whether the hearsay led the jury to a result it otherwise might not have reached.

[Ibid.]

We take note that the Court placed at the top of the list of independent proofs that two eyewitnesses had identified the defendant both in court and out of court.[4] Ibid.

The Supreme Court's Confrontation Clause decision in Branch, decided in 2005, provides further instruction in determining whether that Sixth Amendment

---

[4] Since Irving and Douglas were decided, the Supreme Court in State v. Henderson recognized that reform of our eyewitness identification jurisprudence was necessary because "[s]tudy after study revealed a troubling lack of reliability in eyewitness identifications" and because the previous standard for assessing eyewitness identification evidence "overstate[d] the jury's inherent ability to evaluate evidence offered by eyewitnesses who honestly believe their testimony is accurate." 208 N.J. 208, 218 (2011). Accordingly, in interpreting the plain error analysis described in Irving, we are mindful of the admonition in Henderson concerning the assumption that eyewitness identifications are inherently reliable.

21

right has been violated and in measuring the prejudicial impact of any such violation. The Court reviewed several New Jersey Confrontation Clause cases and discerned that the "common thread that runs through" those precedents was that "a police officer may not imply to the jury that he [or she] possesses superior knowledge, outside the record, that incriminates the defendant." Branch, 182 N.J. at 351.

In Branch, the Court reversed a defendant's robbery and burglary convictions, holding that defendant's right to confrontation had been violated by the investigating police officer's testimony that he had "included defendant's picture in a photographic array because he had developed defendant as a suspect 'based on information received'" from an unspecified source. Id. at 342. That testimony was deemed to be inadmissible hearsay. Ibid.

The Court found that because there "was no trial testimony or evidence" other than the victim's identification of defendant from the photo array "that could have led [police] to focus on defendant as a suspect . . . the jury was left to speculate that the detective had superior knowledge through hearsay information implicating defendant in the crime." Id. at 347–48. That was particularly problematic

> [b]ecause the nameless person who provided the
> 'information' to [the detective] was not called as a

witness, the jury never learned the basis of that person's knowledge regarding defendant's guilt, whether he was a credible source, or whether he had a peculiar interest in the case. Defendant never had an opportunity to confront that anonymous witness and test his credibility in the crucible of cross-examination.

[Id. at 348.]

The Court concluded, "when the logical implication to be drawn from the testimony leads the jury to believe that a non-testifying witness has given the police evidence of the accused's guilt, the testimony should be disallowed as hearsay." Id. at 349 (quoting Bankston, 63 N.J. at 271). The Court added that although a police officer "may testify that he went to the scene of a crime based 'upon information received,'" id. at 351 (citing Bankston, 63 N.J. at 268), the Court expressly rejected the use of such "seemingly neutral language" to explain why a defendant's photo was added to a photo array. Id. at 352 (rejecting dicta approving such language in Irving, 114 N.J. at 447). The Court thus announced a clear rule, explaining, "[w]hy the officer placed the defendant's photograph in the array is of no relevance to the identification process and is highly prejudicial." Ibid. "What counts[,]" the Court added, "is whether the officer fairly arranged and displayed the photographic array and whether the witness made a reliable identification." Ibid. Going forward, the Court permitted police to use the phrase "based on information received" outside of the photo array

23

context, "but only if necessary to rebut a suggestion that they acted arbitrarily, and only if the use of that phrase does not create an inference that the defendant has been implicated in a crime by some unknown person." Ibid.

The Court then turned to whether the admission of such testimony rose to the level of plain error requiring the reversal of Branch's convictions. In concluding that the constitutional error in that instance was not harmless, the Court noted that the "State's evidence was far from overwhelming" as "[n]o physical evidence linked defendant to the scene of the crime" and the descriptions of the perpetrator by the witnesses "differed markedly from defendant's appearance." Id. at 353. The Court acknowledged that this "was a close case" and that "the detective's damaging hearsay testimony . . . may have tipped the scales." Id. at 354. The Court therefore reversed Branch's convictions and remanded for a new trial. Ibid.

Recently, our Supreme Court was presented with a similar issue in Medina. The defendant was convicted of offenses related to a non-fatal slashing that occurred outside of a bar. Medina, 242 N.J. at 401. The identity of the perpetrator was contested at trial. Ibid. The victim positively identified Medina from a photo array, and later also made an in-court identification. Id. at 403–

05. The jury viewed surveillance video of the attack, as well as a video of a previous bar fight involving Medina in which he was clearly seen. Ibid.

The fact-sensitive issue in Medina was whether a detective at trial violated the defendant's Confrontation Clause rights by telling the jury that his photo was included in the photo array "based on . . . the evidence . . . collected . . . [.]" Id. at 405–06. The detective also testified that he had spoken to various witnesses at the bar, including the victim, another man named Rafferty, and "one female who didn't want to get involved." Id. at 405–07. The anonymous woman had identified Medina as the assailant but refused to give a formal statement. Id. at 402.

The Court stressed that the detective "never repeated to the jury what the anonymous woman told officers" and, in fact, "did not imply that the woman gave police any information at all." Id. at 416. The Court also reiterated its emphasis in Bankston that "we were unconcerned 'with mere possible inferences' to be drawn." Id. at 417 (quoting Bankston, 63 N.J. at 271). On those facts, the Court concluded that "the references to the anonymous woman did not create an 'inescapable inference' that she implicated defendant in the attack to the police." Id. at 417 (quoting Bankston, 63 N.J. at 271).

The Court "reiterate[d] that the best practice is to avoid explaining that a defendant's picture was placed in a photo array because he or she was a suspect 'based on information received'" or "based on the evidence collected" as "such language can potentially sweep in inadmissible hearsay by producing the 'inescapable inference' that the officer obtained incriminating information about the defendant beyond the scope of the record." Id. at 420–21 (quoting Branch, 182 N.J. at 352). However, the Court found that no such inference was generated in that case because the detective used the phrase "evidence collected" only "after (1) he explained that Rafferty and [the victim] gave formal statements, (2) the jury watched the surveillance footage . . . , and (3) he read [the victim's] description of the attacker." Id. at 420.

Furthermore, the detective testified "that he had personally watched the surveillance footage before assembling the photo array" and that the victim told him of the earlier fight before the victim identified defendant. Ibid. The Court stressed that,

> most importantly, [the detective] repeatedly told the jury that no one other than Rafferty and [the victim] came forward to give a statement. Viewed in that light, "the logical implication" of [the detective's] testimony was that "the evidence that [he] collected" referred to evidence other than hearsay: the surveillance footage and [the victim's] and Rafferty's formal statements and descriptions of the attacker.

26

[Ibid. (quoting Bankston, 63 N.J. at 271).]

The Court further explained,

> [The officer] did not imply that the woman gave police any information at all. He referenced the anonymous woman twice: once on direct examination and again on redirect examination. In the first instance, he agreed with the prosecutor that she "didn't want to get involved," and in the second, he agreed that she "didn't want to give a statement." [The officer] also explained that he obtained formal statements only from [the victim and his friend Rafferty] because "there was nobody else that wanted to come forward . . . to give a statement, any witnesses or anything like that."
>
>     . . . .
>
> [Further] [t]he record substantiates the Attorney General's contention that the jury likely considered the anonymous woman to be a "dead-end witness." The State not only was careful not to repeat what she told police, but also went to great lengths to suggest that she was not forthcoming. Additionally, the references to the anonymous woman would have seemed less significant than the other relevant evidence in the record. Both [the victim and his friend] gave descriptions of the attacker that matched defendant's picture; the surveillance video captured the incident; and [the victim] unwaveringly identified defendant both at trial and in the array. In sum, we find that the references to the anonymous woman did not create an "inescapable inference" that she implicated defendant in the attack to the police.
>
> [Id. at 416–17.]

27

The Court determined that in those circumstances, the detective's testimony did not violate the Confrontation Clause.

                                    III.

We next apply the legal principles gleaned from the foregoing precedents to the facts in the case before us. The prosecutor in his opening statement set the table for the testimony concerning how police initially identified defendant as a suspect in the robbery. The prosecutor explained to the jury,

> [s]o the police go and speak with this Mr. Haines individual and you're going to hear the officers testify. Immediately they knew it wasn't him. Maybe a little similar facial features but he had just woken up, was there with his girlfriend or wife. He was shorter. They knew right away after talking to this guy this is not him [the robber]. <u>But through the investigation talking to other people, they learn that it's possibly this individual named Freddie Owle</u>.

> [(emphasis added).]

Sergeant Czepiel subsequently testified regarding his interaction with Mr. and Mrs. Haines, neither of whom testified at trial. Sergeant Czepiel told the jury that he immediately discounted Mr. Haines as a suspect because he did not match the description given by the witnesses. Czepiel testified that he then provided the suspect's description to Mr. and Mrs. Haines. Czepiel told the jury that Mrs. Haines "made a statement that she has an idea of who she believed the

suspect was." The sergeant then told the jury that Mrs. Haines named defendant and provided police the number of the room at the Budget Inn at which defendant resided.

The State at trial presented yet additional testimony explaining why defendant's photo was placed in the array. Lieutenant Jacoby told the jury that he included defendant's photo in the array based on Sergeant Czepiel's and Detective Powell's representation that "they developed" defendant as a suspect. Lieutenant Jacoby testified that he chose photos for the array "resembl[ing] the suspect in characteristics that were [developed] both by the description given by the witnesses and by any other investigative means" available. (emphasis added) On further questioning by the prosecutor, Jacoby repeated that "during the investigation" Sergant Czepiel and Detective Powell had "developed a name."

Defendant did not object to any of this testimony, nor to the prosecutor's opening remarks regarding what police had learned about the suspect from "other people." Therefore, as in Branch and Irving, we apply the plain error standard of review. R. 2:10-2; see also State v. Singh, 245 N.J. 1, 13 (2021).

## A.

We first consider whether defendant's Confrontation Clause rights were violated. Lieutenant Jacoby's testimony that defendant's picture was included

in the photo array based on "other investigative means" and on Sergeant Czepiel and Lieutenant Powell having "developed a suspect" violated the clear rule that police witnesses should not explain to a jury why a defendant's photo was included in an array, even by using "seemingly neutral language . . . ." Branch, 182 N.J. at 352. We are concerned that the trial judge, assistant prosecutor, and defense counsel all seem to have been unaware that such testimony is irrelevant at trial and can be highly prejudicial.[5] See id. at 352.

But Lieutenant Jacoby's testimony, while clearly improper, is not the principal cause for concern in this case. We are especially troubled by Sergeant Czepiel's more explicit trial testimony that Mrs. Haines "made a statement that she has an idea of who she believed the suspect was," namely, defendant. That remark falls squarely under the prohibition against hearsay testimony.

The State argues on appeal that the logical inference to be drawn from that hearsay statement is that Mrs. Haines mentioned defendant by name because he met the description of the robber that had been provided to her by Detective

---

[5] As we have noted, in this case, there was no Wade hearing. See supra note 2. Had there been such a hearing, we believe it would have been prudent for the trial court to remind the parties that testimony elicited at a Wade hearing regarding the investigation leading to the preparation of a photo-array is generally not relevant at trial and should not be repeated before the jury.

Czepiel and not because she was aware of defendant's complicity in the robberies or any other criminal acts.[6] But that is not the only logical inference that could be drawn from Czepiel's testimony as to why Mrs. Haines had "an idea" why defendant was the person police were looking for.[7] We note that at a sidebar discussion, it was revealed that Mrs. Haines implicated defendant

---

[6] We note that there is nothing in the record to indicate that Sergeant Czepiel showed Mrs. Haines a photograph of the perpetrator taken from surveillance video of either robbery.

[7] We decline to interpret the phrase "inescapable inference," see Bankston, 63 N.J. at 271; Medina, 242 N.J. at 416–17, to mean that no other inference could be drawn from the hearsay testimony. Cf. Branch, 182 N.J. at 347–49 (emphases added) (noting "The jury was left to speculate that the detective had superior knowledge through hearsay information implicating defendant in the crime" and "when the logical implication to be drawn from the testimony leads the jury to believe that a non-testifying witness has given the police evidence of the accused's guilt, the testimony should be disallowed as hearsay"); Favre v. Henderson, 464 F.2d 359, 364 (5th Cir. 1972) (emphasis added) (right to confrontation violated where "testimony was admitted which led to the clear and logical inference that out-of-court declarants believed and said that [the defendant] was guilty of the crime charged."); Hutchins v. Wainwright, 715 F.2d 512, 516 (11th Cir. 1983) (emphasis added) (right to confrontation violated where, "[a]lthough the officers' testimony may not have quoted the exact words of the informant, the nature and substance of the statements suggesting there was an eyewitness and what he knew was readily inferred"); People v. Vadell, 505 N.Y.S.2d 635 (App. Div. 1986) (emphasis added) (noting that the right to confrontation was violated where "[t]he clear implication of this question and answer . . . was that defendant had told his wife that he had participated in the homicide").

because she was aware that he had previously "committed multiple robberies."[8] In other words, she <u>did</u> provide police incriminating information about defendant that was beyond the record.

We recognize that the jury was unaware of that information, which would have been highly prejudicial independent of the hearsay problem. Even so, the true reason why Mrs. Haines directed police to defendant by name makes clear that there were other possible explanations for why she did so besides the fact that defendant met the general description of the robber that Czepiel had given her.

We add that the jury was told that Czepiel went to Haines' room in the first place because Matthew Haines was a "possible suspect." When Czepiel immediately discounted the possibility that Mr. Haines was the robber, the officers did not just leave. Rather, Czepiel solicited aid from the Haines in finding the culprit, who might have had confederates. That circumstance bolsters the impermissible inference that the Haines were aware of information about the robberies or the robber that was not disclosed to the jury.

---

[8] When the Wawa and Valero robberies occurred, defendant was on parole from a fifteen-year prison sentence imposed on his six previous first-degree robbery convictions. He was released from prison only three months before the Wawa and Valero robberies.

We believe the facts of this case are more analogous to the facts in Branch than Medina. Certainly, the hearsay testimony regarding Mrs. Haines' role was far more direct and detailed than the testimony in Medina concerning the role played by the anonymous woman who refused to give a formal statement to police. The Court in Medina stressed that there was no implication that the anonymous woman gave police any incriminating information. 242 N.J. at 416. In contrast, there is a plausible implication that Mrs. Haines provided incriminating information to Czepiel—as in fact she did. Considering the totality of the circumstances, and viewed through the lens of the prosecutor's opening statement that "through the investigation talking to other people, [the police] learn that it's possibly this individual named Freddie Owle," we conclude that the jury "was left to speculate that the detective had superior knowledge through hearsay information implicating defendant in the crime." See Branch, 182 N.J. at 347–48; Bankston, 63 N.J. at 271.

We are thus satisfied that even though Sergeant Czepiel did not specifically repeat any incriminating information learned from a non-testifying source (e.g., that Mrs. Haines was aware of defendant's criminal record), the officers' testimony created an inescapable inference that a non-testifying source implicated defendant in contravention of defendant's Confrontation Clause

rights. See Medina, 242 N.J. at 415–16. Indeed, Mrs. Haines—a non-testifying source—explicitly implicated defendant by identifying him as a suspect in the robberies. Compared to other cases where the Supreme Court found a constitutional violation based upon far more neutral testimony, see e.g. Branch, 182 N.J. at 352 (referring to "seemingly neutral language"), we think the Confrontation Clause violation in this case is particularly obvious and egregious. Cf. State v. Watson, __ N.J. Super. __, __ (App. Div. 2022) (slip op. at 58) (finding that "while the [officer's] testimony [about consulting with another law enforcement agency] technically crossed the line under Confrontation Clause analysis, it was by no means an obvious and blatant violation of defendant's right to confront the witnesses against him"). We add that any harm associated with the violation in this case was compounded by the prosecutor's reference to inadmissible hearsay in his opening argument which referenced non-testifying sources. Cf. Id. at __ (slip op. at ) (concluding that "the prosecutor's summation neither exploited nor reinforced the testimony that violated the Sixth Amendment[,]" and therefore did not compound the prejudice flowing from the Confrontation Clause violation).

34

B.

The conclusion that defendant's Sixth Amendment rights were violated, by the admission of hearsay testimony, does not end our inquiry. We must next consider whether the violations rise to the level of plain error. In Weaver, the Court explained that "[w]hen evidence is admitted that contravenes not only the hearsay rule but also a constitutional right, an appellate court must determine whether the error impacted the verdict." 219 N.J. at 154 (citing Chapman, 386 U.S. at 24). "The standard has been phrased as requiring a reviewing court 'to declare a belief that [the error] was harmless beyond a reasonable doubt.'" Ibid. (alteration in original).

The State contends that to the extent any error occurred in the admission of Czepiel's testimony, it should be deemed to have been "invited" because defense counsel not only failed to object, but cross-examined Czepiel regarding what Mrs. Haines had told him. We disagree that the invited error doctrine applies in these circumstances

Under that doctrine, "trial errors that 'were induced, encouraged or acquiesced in or consented to by defense counsel ordinarily are not a basis for reversal on appeal . . . .'" State v. A.R., 213 N.J. 542, 561 (2013) (quoting State v. Corsaro, 107 N.J. 339, 345 (1987)). The doctrine applies "when a defendant

35

in some way has led the court into error" and "acknowledges the common-sense notion that a 'disappointed litigant' cannot argue on appeal that a prior ruling was erroneous 'when that party urged the lower court to adopt the proposition now alleged to be error.'" Ibid. (first quoting State v. Jenkins, 178 N.J. 347, 359 (2004); and then N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 340 (2010)). In Corsaro, the Court succinctly characterized invited error as error that defense counsel has "induced." 107 N.J. at 346. In Jenkins, the Court further explained that the doctrine of invited error as applied in criminal cases "is designed to prevent defendants from manipulating the system." 178 N.J. at 359.

In this instance, it was the State, not defendant, that "led the court into error" by presenting inadmissible evidence to the jury and by setting the table for that evidence in the prosecutor's opening arguments.[9] Defense counsel's strategic decision to cross-examine Sergeant Czepiel regarding the erroneously admitted evidence may have risked re-enforcing the significance of that hearsay testimony for the jury, but that circumstance did not "manipulate the system" or otherwise invoke the harmless error doctrine.

---

[9] We note the trial court properly instructed the jury that the opening and closing arguments of counsel are not evidence and should not be considered as such.

We thus turn to whether the hearsay evidence was so prejudicial as to constitute plain error. We stress at the outset of our analysis that there were two distinct Confrontation Clause violations in this case: (1) Lieutenant Jacoby's testimony explaining why defendant's picture was included in a photo array, in clear violation of Branch, 182 N.J. at 352, and (2) the incriminating hearsay statement attributed to Mrs. Haines, which is an even more direct and serious violation of defendant's Confrontation Clause rights. The latter violation, moreover, was amplified by the prosecutor's opening arguments to the jury.

We are mindful of the well-established principle that a failure to object permits an inference that any error in admitting the testimony was not prejudicial. See State v. Nelson, 173 N.J. 417, 471 (2002); see also Hemphill, 142 S. Ct. at 694 (Alito, J., concurring) (quoting Melendez-Diaz v. Massachusetts, 557 U.S. 305, 314 n.3 (2009)) (noting a defendant can impliedly waive his Sixth Amendment right by "'fail[ing] to object to the offending evidence' in accordance with the procedural standards fixed by state law."). As the Supreme Court explained in Irving, failure to make a timely objection indicates that defense counsel did not believe the remarks were prejudicial within the atmosphere of the trial. 114 N.J. at 444; see also State v. Frost, 158 N.J. 76, 84 (1999) (stating "[t]he failure to object suggests that defense counsel

37

did not believe the remarks were prejudicial at the time they were made"). Failure to object also deprives the court the opportunity to take curative actions. Irving, 114 N.J. at 444. Accordingly, defendant's failure in this case to object either to the prosecutor's opening argument or to the testimony of the police officers regarding information from non-testifying sources that led them to defendant militates against a finding of reversible error.

We also are mindful of the plain error analysis undertaken by the Supreme Court in Branch and Medina, which focused on the strength of the State's case. The State argues that, even if error occurred, it did not rise to the level of plain error as there was ample evidence to connect defendant to the crimes independently of the officer's testimony regarding how they initially identified defendant as a suspect. See Douglas, 204 N.J. Super at 275 (noting the State's case was "fortified by direct positive evidence").

To ensure we fully and fairly consider the State's argument, we reproduce verbatim the synopsis of the incriminating evidence from the State's response brief:

> As in Medina, the jury here heard ample evidence to connect defendant to the crimes independently of the officers' testimony that defendant was included in the photo array after speaking to Mr. Haines and to defendant. Defendant was identified by Ms. Rivera after she had time to view his face and the surveillance

footage from the Wawa. Additionally, defendant's DNA was found in a mask that was found days after the robberies near the property line of the Valero gas station. A metal rod and a dark colored cap were found in defendant's girlfriend's car. Ms. Rivera and Ms. Craft identified defendant in court.

Our own review of the trial record demonstrates that while the State's proofs were by no means "very weak," see Douglas, 204 N.J. Super. at 275, as in Branch, the trial evidence was "far from overwhelming." 182 N.J. at 353; see Watson, __ N.J. Super. at __ (slip op. at 62, 64) (acknowledging "that the State's evidence was not overwhelming[,]" but nonetheless determining the Confrontation Clause violation was harmless). As often is true in criminal cases that go to trial, this contest falls somewhere between the polar extremes of "very weak" and "overwhelming" evidence of guilt.

In Branch, there was "[n]o physical evidence link[ing] defendant to the scene of the crime." 182 N.J. at 353. We therefore summarize the physical evidence presented in the matter before us. The ski mask containing defendant's DNA is relevant and incriminating. However, it was not found at the crime scene. Rather, the ski mask was found in the woods near the Valero gas station, which is also near where defendant resided. Thus, the ski mask, while certainly incriminating evidence, could not be definitively tied to the crime because it

could have been dropped near Valero at another time unrelated to the flight from robbery.

We deem it to be significant that a metal pipe similar to the weapon used in the Valero robbery was found in defendant's girlfriend's car. We note that Vasisht testified that the pipe used by the robber was "like" the one found later in the Ford Taurus. We also note, however, the State provided no corroborating testimony regarding either the weapon or the perpetrator from the other gas station attendant, Sankar Singh.

In his closing statement, the prosecutor argued that the Wawa surveillance video showed an emblem on the back of the hat worn by the robber that was consistent with the Eagles emblem on the hat recovered from Petroski's vehicle. The prosecutor replayed the video for the jury, rhetorically asking, "[w]hat's that on the back of his hat? You've got to look at the evidence closely, people." But so far as the record before us reflects, the State did not introduce an enhanced or enlarged screenshot from the video confirming that the hat worn by the robber bore the same distinctive emblem as on the hat recovered from the vehicle. The remarks and arguments of counsel are not evidence. See State v. Berry, 471 N.J. Super. 76, 103 (App. Div. 2022) (citing State v. Timmendequas, 161 N.J. 515. 578 (1999)).

We add to our review of the physical evidence that although the State does not mention the Newport cigarettes in the legal argument section of its response brief, we find it relevant that at the time of his arrest, defendant was holding a pack of the same brand of cigarettes as had been demanded by the robber at the Wawa. We note, however, that the State presented no evidence that the cigarette pack defendant was holding was nearly full, indicating that it had been obtained recently during the Wawa robbery. Nor does the record show that the State examined the serial number on the pack defendant was holding that might have shown that it had been part of the Wawa inventory.

Aside from the corroborative physical evidence, the State's case hinged on the eyewitness identifications made by the two Wawa employees. On appeal as at trial, the State relies heavily on their testimony. As we have noted, in view of <u>Henderson</u> and its progeny, we must be careful not to overstate the value of eyewitness testimony, 208 N.J. at 218, especially when there are differences in the initial description given of the perpetrator and defendant's actual appearance. <u>See</u> <u>supra</u> Section II; <u>cf.</u> <u>Branch</u>, 128 N.J. at 353 (noting the descriptions of the perpetrator by the witnesses "differed markedly from defendant's appearance").

In the present case, Ms. Rivera positively identified defendant in both a photo array identification procedure administered the morning after the robbery

and an in-court identification procedure at the trial nearly two years later. We note, however, that her initial description, provided just minutes after the robbery, highlighted one of the perpetrator's distinguishing characteristics. Ms. Rivera explained to Sergeant Czepiel that the robber had "the bluest eyes I've ever seen." But it is undisputed that defendant does not have blue eyes. In his closing argument, the prosecutor sought to bolster Rivera's ability to identify the perpetrator by replaying for the jury the Wawa surveillance video, highlighting a moment in the recording where it appeared that Rivera made eye contact with the robber. The prosecutor argued to the jury, "[t]hat's eye contact." From our perspective in determining whether the State's evidence was overwhelming, the video proof that Rivera made eye contact with the robber underscores the significance of the discrepancy between the description of the robber she first gave to police and defendant's actual appearance. See Branch, 128 N.J. at 353; cf. Watson, __ N.J. Super at __ (slip op. at  64) (noting the State's case was fortified by an unequivocal positive identification of the perpetrator shown in the surveillance video by the defendant's former girlfriend).

We also take note of what was not presented at trial by the State. Although Ms. Craft made a positive in-court identification, there is no indication in the record that she ever made an out-of-court identification or even was asked to do

42

so. Craft candidly acknowledged at trial that she could not remember any distinguishing characteristics of the robber because she was too scared to remember details. Cf. Henderson, 208 N.J. at 261–62 (recognizing that high levels of stress undermine the reliability of eyewitness identification and that eyewitness memory of such high-stress events "may be subject to substantial error."). That circumstance undermines the reliability of the identification she made in court when she was shown the surveillance video of the robbery and when she observed defendant live in the courtroom. See Watson, __ N.J. Super. at __ (slip op. at 108–54) (discussing the inherent suggestiveness of an in-court identification procedure and addressing the defendant's contentions regarding the reliability of "first time" in-court identifications).

Furthermore, although the testifying gas station attendant, Mr. Vasisht, stated that the pipe found in the Taurus registered to Petroski was "like" the weapon used in the robbery based on its handle, he was unable to identify defendant. The other eyewitness to the Valero robbery, Sankar Singh, never testified, never gave a statement, never participated in an out-of-court identification procedure, and never was shown the pipe retrieved from Petroski's vehicle.

A-4829-18

Importantly, the surveillance videos of the two robberies do not show the perpetrator so clearly as to permit the jury to make an independent identification. Cf. Watson, __ N.J. Super. at __ (slip op. at 102) (noting the defendant's girlfriend was able to positively and unequivocally identify defendant as the robber from the bank surveillance video and a screenshot from the video, leading the court to conclude that "the jurors could see for themselves the perpetrator shown in the surveillance video").

We conclude our review of the incriminating trial proofs by emphasizing that the issue before us in this appeal is not whether the State presented sufficient evidence to convict.[10] Rather, our fact-sensitive inquiry in applying plain error analysis focuses on whether the inadmissible hearsay evidence "may have tipped the scales." Branch, 182 N.J. at 354.

We emphasize that the seriousness of the constitutional violation—or in this case, the combined effect of two distinct Sixth Amendment violations—is

---

[10] We are not addressing an appeal from the denial of a motion for a judgment of acquittal notwithstanding a guilty verdict. Cf. State v. Lodzinski, 249 N.J. 116, 144 (2021) (emphasis added) (citing State v. Williams, 218 N.J. 576, 594 (2014)) (a court reviewing denial of a motion for a judgment of acquittal notwithstanding a guilty verdict pursuant to Rule 3:18-2 "must view the entirety of the direct and circumstantial evidence presented by the State and the defendant and give the State the benefit of all the favorable evidence and all the favorable inferences drawn from that evidence, and then determine whether a reasonable jury could find guilt beyond a reasonable doubt.").

an important consideration in determining the appropriate remedy. We also reiterate and stress that the State shoulders the burden to convince us beyond a reasonable doubt that the jury verdict would have been the same in the absence of the Confrontation Clause violations. Ibid.; Irving, 114 N.J. at 447. The beyond-a-reasonable-doubt standard is a formidable threshold to mount. In view of that demanding standard, we cannot declare our belief that the repeated Confrontation Clause errors did not have the capacity to cause an unjust result. Branch, 182 N.J. at 354 (citing R. 2:10-2); cf. Watson, __ N.J. Super. at __ (slip op. at 64) (concluding that because the officer's "fleeting hearsay testimony— essentially a three-word answer to the prosecutor's problematic question—[had not] 'tipped the scales' as in Branch . . .[,]" the Confrontation Clause violation was harmless constitutional error). We are thus constrained to vacate defendant's convictions and remand for a new trial.

## IV.

Because we remand for a new trial, we need not address most of defendant's remaining contentions regarding asserted trial errors and the sentence imposed, including defendant's argument, raised for the first time on appeal, that the trial court committed plain error by not instructing the jury

concerning out-of-court identification procedures sua sponte.[11] We presume that defendant on remand will request the trial court to instruct the jury regarding the photo-array identification procedure administered to Ms. Rivera.[12]

We need only briefly address the arguments raised in defendant's pro se supplemental brief, as those contentions lack sufficient merit to warrant extensive discussion. See R. 2:11-3(e)(2). We add the following comments.

Defendant contends that the indictment was defective as it was not "returned in open court before the 'assignment judge' . . . nor endorsed as a 'true bill'" and the "indictment shows no date nor time of 'when' it was filed" in Superior Court. Defendant provides no support in the record, however, for any of his claims regarding error in the grand jury process.

Although defendant's pro se brief is unclear, he also appears to assert that he is immune from prosecution because he is Native American and the "grand

---

[11] We note that the trial judge did instruct the jury on in-court identifications. See Model Jury Charges (Criminal), "In-Court Identification Only" (rev. July 19, 2012). Additionally, we note that defendant does not contend that police violated the procedures for administering a photo-array identification procedure as prescribed in Henderson, or that an out-of-court identification procedure was impermissibly suggestive. See supra note 2.

[12] We note that since the trial, the Model Jury Charge has been revised. See Model Jury Charges (Criminal), "Identification: In-Court and Out-of-Court Identifications" (rev. May 18, 2020).

jury is an English institution."  He provides no legal support for the proposition that he may not be tried in the New Jersey criminal courts because of his Native American heritage.

Defendant further argues in his pro se supplemental brief that the prosecutor's charging decision was made in bad faith.  Defendant provides no specificity, however, as to how the prosecutor allegedly engaged in bad faith in seeking an indictment against defendant for the robberies of the Wawa and Valero.  The law is well-settled that "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his [or her] discretion."  State v. Medina, 349 N.J. Super. 108, 127–28 (App. Div. 2002) (quoting Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978)).  Further, "the decision to prosecute is particularly ill-suited to judicial review."  Ibid. (quoting Wayte v. United States, 470 U.S. 598, 607 (1985)).  We do not hesitate to conclude that in this instance, there was ample probable cause to support the charges associated with the Wawa and Valero robberies.

Reversed and remanded for proceedings consistent with this opinion.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4829-18